[No. A042785. First Dist., Div. Five. Apr. 19, 1989.]

AEROJET-GENERAL CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY,
Respondent;
CHESHIRE AND COMPANIES et al., Real Parties in Interest.

**COUNSEL**

Moses Lasky, John E. Munter, Scott P. DeVries, Lasky, Haas, Cohler & Munter and William L. Berry, Jr., for Petitioners.

John K. Van de Kamp, Attorney General, Andrea S. Ordin, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, and Timothy R. Patterson, Deputy Attorney General, as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Barry L. Bunshoft, Richard L. Seabolt, Andrew K. Gordon, Bonnie L. O'Niell, Brian A. Kelly, Hancock, Rothert & Bunshoft, Steven M. Crane and Morris, Polich & Purdy for Real Parties in Interest.

OPINION

HANING, J.—This extraordinary writ proceeding arises from a declaratory relief action brought against environmental polluters by their insurers. Petitioners Aerojet-General Corporation and Cordova Chemical Company seek a writ of mandate to set aside an order granting real party insurance companies' summary adjudication of the issue that *no portion of* environmental cleanup and restoration costs, imposed upon petitioners by the state and federal governments, constitute damages within the meaning of petitioners' comprehensive general liability policies. We issued an order to show cause in lieu of an alternative writ, and heard oral argument. We issue a peremptory writ of mandate.

I.

Since the early 1950's petitioners have operated a research and development facility near Sacramento, California, where they developed rocket engines, rocket components, and related products for the country's aerospace and defense programs. Petitioners' operations involved the use of various toxic chemicals. In 1979 government regulatory agencies discovered that toxic chemicals had entered the soil and groundwater beneath petitioners' facility, and had leached into the groundwater of neighboring properties and into the American River.

On December 26, 1979, the State of California filed a "Complaint for Injunction[,] Abatement, and Other Equitable and Civil Monetary Relief" against petitioners in Sacramento County Superior Court. The state alleged that petitioners' discharge of toxic chemical wastes had polluted state-owned waters, both groundwater and the American River, causing "impairment and destruction" of a "natural resource of this state."[1] In addition to civil penalties and an injunction to prevent further discharge of hazardous substances into state waters, the state's lawsuit sought to compel cleanup of the pollution. The state alleged that protection of the water resource required the removal of hazardous wastes from the groundwater to the extent possible, and removal of such wastes which had yet to reach groundwater from petitioners' disposal sites. Accordingly, the state's complaint included a cause of action for "Recovery of Expenditures for Cleanup, Abatement

---

[1] Water Code section 102 provides, in part, that "[a]ll water within the State is the property of the people of the State, . . ." In suing petitioners the state was exercising its power to ensure a reasonable and beneficial use of the water in the public interest. (Cal. Const., art. X, § 2; see Wat. Code, § 12922, declaring the People "have a primary interest in the correction and prevention of irreparable damage to, or impaired use of, the ground water basins of this State.") The state also asserted a "public trust" interest in the American River. (See *National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 445-453 [189 Cal.Rptr. 346, 658 P.2d 709], cert. den., 464 U.S. 977 [78 L.Ed.2d 351, 104 S.Ct. 413].)

and Remedial Work" under Water Code section 13304. The state alleged it had "spent, and [was] continuing to spend, substantial sums for performance of cleanup, abatement and remedial work," and prayed for reimbursement from petitioners for the amounts expended.

On January 15, 1986, the United States Department of Justice, at the request of the Environmental Protection Agency, brought suit against petitioners in the United States District Court for the Eastern District of California. The action was brought pursuant to sections 106(a) and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. §§ 9606(a), 9607), and other federal statutes. The federal complaint alleged that hazardous chemicals and pollutants had migrated from petitioners' facility to the soil, then to the groundwater and ultimately to the American River, a navigable waterway of the United States. The United States claimed both present and future damage to the environment, and sought injunctive relief to abate an "imminent and substantial endangerment to public health, welfare or [the] environment."

The complaint also alleged that the United States, in order to combat the effects of petitioners' pollution, had incurred and was incurring "response costs" as defined by CERCLA (see 42 U.S.C. § 9601(25)), for which petitioners were liable (42 U.S.C. § 9607). CERCLA defines the costs of "response" to include costs of removal of hazardous substances from the environment and the costs of other remedial work. (42 U.S.C. § 9601(25).)[2] CERCLA provides that any person or business entity responsible for a release or threatened release of hazardous substances "shall be liable for . . . [¶] all costs of removal or remedial action incurred by the United States Government or a State . . . ." (42 U.S.C. § 9607(a)(4)(A).) The same day the federal complaint was filed, the State of California filed a similar CERCLA complaint in the Eastern District. The state's complaint generally tracks the federal pleading and likewise alleged the state had incurred "response costs" as defined by CERCLA.

Under the CERCLA statutory scheme, the government may postpone litigation of liability and obtain an injunction to compel a polluter to clean up its pollution, or the government may conduct the cleanup itself and then sue the polluter for reimbursement. (42 U.S.C. §§ 9606, 9607; see *United*

---

[2] The definition of response costs includes two basic components: costs of removal, defined as the cleanup or removal of hazardous substances in the event of their release or threatened release into the environment (42 U.S.C. § 9601(23)), and costs of remedial actions, defined as "actions consistent with permanent remedy taken instead of or in addition to removal actions . . . to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." (42 U.S.C. § 9601(24).)

*States* v. *Bliss* (E.D.Mo. 1987) 667 F.Supp. 1298.) As a third alternative, CERCLA provides that the federal government may designate the targeted polluter as a "potentially responsible part[y]" and, to foster settlement of a CERCLA action, may permit the polluter to clean up or otherwise respond to environmental pollution. Such an agreement is generally embodied in a consent decree. (42 U.S.C. § 9622(a), (b), (d); see generally Note, *Superfund Settlements: The Failed Promise of the 1986 Amendments,* (1988) 74 Va. L. Rev. 123.)

Although we are not provided with precise information, it is not disputed that petitioners have responded to the government lawsuits by engaging in cleanup activities designed to correct and mitigate environmental damage and facilitate a settlement of the actions. Petitioners claim to have expended "tens of millions of dollars" on cleanup, removal of chemicals from the groundwater, and activity designed to prevent chemicals already in the soil from migrating into the groundwater. We are informed that the state and federal governments and petitioners have entered into a consent decree concerning response costs, which is still subject to public comment (see 42 U.S.C. § 9622(d)(2)(B)), and is not included in the record. The CERCLA consent decree evidently incorporates not only the state and federal CERCLA actions, but also the state action seeking analogous cleanup costs under Water Code section 13304.

Petitioners seek to recoup their response costs from their liability insurers. During the period of their Sacramento operations petitioners have carried comprehensive general liability (CGL) insurance purchased from real parties in interest. The parties agree that the operative coverage provision of virtually all the policies is essentially identical: the insurer agreed "[t]o pay on behalf of the Insured all sums which the Insured shall become *legally obligated to pay as damages because of injury to or loss, destruction or loss of use of property.*" (Italics added.) The policies do not specifically define "damages." Petitioners tendered defense of the government actions to real parties, who refused to defend and denied coverage.

To seek resolution of the coverage question, two of real party insurers brought the instant declaratory relief action against petitioners and remaining real parties. The action sought a declaration that the insurers had no duty to indemnify petitioners under the policy language. Real parties then moved for summary adjudication of two issues: (1) that the government actions against petitioners "assert only claims for equitable relief," and (2) that the policy language quoted above "limit[s] the insurers' obligations to legal claims for 'damages' asserted against the insured, [and the insurers] have no obligation with respect to claims for equitable relief asserted against the insured[.]"

No extrinsic evidence touching upon the parties' interpretation of the term "damages," or any other portion of the coverage clause, was admitted in support of the motion or as evidence of an undisputed material fact. Rather, the motion argued that as a matter of law "damages" as used in the policy must be interpreted in a strictly technical sense to mean damages awarded in an action at law, but not to response costs in CERCLA litigation.

The trial court granted real parties' motion for summary adjudication of both issues, i.e., that the government claims sought equitable relief and that the policy language did not afford coverage for equitable relief, but only for a traditional award of damages in an action at law. The trial court thus ruled as a matter of law that no portion of environmental cleanup costs are "damages" within the meaning of the policies.[3]

This timely petition followed.

## II.

Petitioners contend the policies cover CERCLA response costs because the layperson buying such insurance would reasonably expect that an agreement "[t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or loss, destruction or loss of use of property" includes any monetary outlay incurred under compulsion of law. Real parties, noting that CERCLA remedies are generally classified as forms of equitable relief, respond that "damages" unambiguously refers only to an award of legal damages in an

---

[3] The parties, both in their briefs and at oral argument, have persistently referred to various items of extrinsic evidence supposedly presented to the trial court and involved in its decision on the motion. Although some extrinsic evidence was referred to in support of and in opposition to the motion for summary adjudication, the purported evidence was not relied upon in the statements of material fact. Indeed, with both parties arguing as if the issue was purely one of law, the factual matters dubbed "extrinsic evidence" were seemingly offered only for informational purposes. At the hearing on the motion, counsel on both sides asserted the motion raised an issue of law. More significantly, our review of the record reveals that *all* of the extrinsic evidence on both sides of the motion for summary adjudication was stricken by rulings granting cross-motions to strike. Neither petitioners nor real parties have assigned error to these rulings.

Claiming the extrinsic evidence had been considered by the trial court in deciding a motion to reconsider, petitioners argue from the evidence in this court seeking a ruling that at the very least interpretation must await trial. The evidence, however, was not considered by the court below. The court, after observing that petitioners had argued the issue initially as a point of law, stated: "I will deny the motion for reconsideration. I am basing my denial on the basis of the original ruling I made, *not the evidence that was presented in the motion for reconsideration, because I don't think it was properly before me. It should have been brought before me at the time the response was made to the motion . . . for summary adjudication. . . .* [¶] . . . In looking it over I still think it's a matter of law. . . ." (Italics added.)

action at law, and not expenses incurred to comply with orders granting equitable relief or to comply with environmental laws and regulations.

After an examination of both California law and the considerable body of federal and sister state decisions resolving this issue under CERCLA, we conclude that the policies generally cover CERCLA response costs. Because the trial court reached a contrary legal conclusion, petitioners are entitled to relief.[4] We emphasize that we determine only that some portion of the response costs are covered under the policies of real parties. We do not attempt to divine the exact components of those costs, nor can we at this stage of the proceedings. Neither do we determine issues of exclusion of coverage, which are not before us.

### A.

■ Since we have been called upon to interpret the policy without extrinsic evidence, the interpretation is one of law (*Chong* v. *Fremont Indemnity Co.* (1988) 202 Cal.App.3d 1097, 1100 [249 Cal.Rptr. 264]; see *Congleton* v. *National Union Fire Ins. Co.* (1987) 189 Cal.App.3d 51, 59 [234 Cal.Rptr. 218]; *Jarrett* v. *Allstate Ins. Co.* (1962) 209 Cal.App.2d 804, 810 [26 Cal.Rptr. 231]), and we are not bound by the legal interpretation made by the trial court. (*Sayble* v. *Feinman* (1978) 76 Cal.App.3d 509, 512-513 [142 Cal.Rptr. 895]; *Globe Indem. Co.* v. *State of California* (1974) 43 Cal.App.3d 745, 749 [118 Cal.Rptr. 75].)

In interpreting an insurance contract we are guided by well-established rules. ■ An insurance policy "should be read as a lay[person] would read it and not as it might be analyzed by an attorney or an insurance expert." (*Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089], citation omitted.) " 'In the absence of circumstances indicating a contrary intention, words in an insurance policy are to be used in their plain, ordinary and popular sense rather than according to their strict legal meaning. [Citations.]' " (*Allstate Ins. Co.* v. *Thompson* (1988) 206 Cal.App.3d 933, 938 [254 Cal.Rptr. 84], quoting *Jarrett* v. *Allstate Ins. Co., supra,* 209 Cal.App.2d at p. 811.) "Words used in an insurance policy are to be interpreted according to the plain meaning which a lay[person] would ordinarily attach to them. Courts

---

[4] Thus, we do not reach petitioners' secondary and tertiary arguments. Petitioners contend that should we disagree with their primary position, the interpretation issue must be resolved as a question of fact at trial. Petitioners also advance a "fallback" contention that the extrinsic evidence proffered in support of the motion for reconsideration precludes summary adjudication in real parties' favor. Because this "evidence" was not considered by the trial court (see fn. 3, *ante*), this argument is without merit. (Cf. *Mahoney* v. *Superior Court* (1983) 142 Cal.App.3d 937, 940, fn. 2 [191 Cal.Rptr. 425]; *Lemelle* v. *Superior Court* (1978) 77 Cal.App.3d 148, 165-166, fn. 5 [143 Cal.Rptr. 450].)

will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764], citations omitted.)

■ Whether there is an ambiguity in policy language is to be determined from the perspective of the layperson. (*Spaid* v. *Cal-Western States Life Ins. Co.* (1982) 130 Cal.App.3d 803, 806 [182 Cal.Rptr. 3, 29 A.L.R.4th 1224].) Any such ambiguity is to be resolved against the insurer. (*Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d at p. 807; *Insurance Co. of North America* v. *Sam Harris Constr. Co.* (1978) 22 Cal.3d 409, 412-413 [149 Cal.Rptr. 292, 583 P.2d 1335].) ■ To protect the insured's reasonable expectation of coverage, the policy will be given such interpretation as "semantically permissible" to "fairly achieve its object of providing indemnity for the loss to which the insurance relates." (*Harris* v. *Glens Falls Ins. Co.* (1972) 6 Cal.3d 699, 701 [100 Cal.Rptr. 133, 493 P.2d 861], citations omitted; *Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d at pp. 807-808.) If the ambiguity relates to the extent of coverage, " 'the language will be understood in its most inclusive sense, for the benefit of the insured.' " (*Globe Indem. Co.* v. *State of California, supra,* 43 Cal.App.3d at p. 750, italics omitted, quoting *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437-438 [296 P.2d 801, 57 A.L.R.2d 914].) ■ Whether the insured's expectation of coverage is reasonable is a question of law. (*Hallmark Ins. Co.* v. *Superior Court* (1988) 201 Cal.App.3d 1014, 1019 [247 Cal.Rptr. 638].)

B.

For ease of reference, the pertinent coverage language is here restated: "To pay on behalf of the Insured all sums which the Insured shall become *legally obligated to pay as damages because of injury to or loss, destruction or loss of use of property.*" (Italics added.)

■ In contending this clause provides coverage for environmental response costs, petitioners submit that the term "damages" is either unambiguous, or is ambiguous and therefore to be construed against the insurers. Asserting that "damages" unambiguously includes response costs, petitioners argue that "damages" is not to be accorded its technical meaning of damages awarded in an action at law, but its ordinary plain meaning. Petitioners contend the ordinary plain meaning of "damages" includes any sums payable under sanction of law, regardless of the nature of the proceeding or of the relief sought. (See, e.g., Webster's New Collegiate Dict. p. 286 ["damages" defined as "compensation in money imposed by law for loss or injury"]; Black's Law Dict. (5th ed. 1979) pp. 351-352 ["damages" defined as "[a] pecuniary compensation or indemnity, which may be recovered in

the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission or negligence of another"].)

It is not unreasonable to argue that while a technical meaning of "damages" may refer to an award in an action at law, the ordinary plain meaning of damages is broader and covers environmental response costs incurred at the behest of government entities and under express or implied sanction of law. The argument finds some support in Civil Code section 3281, which defines "damages" as compensation for the "detriment [caused by] the unlawful act or omission of another . . . ." Petitioners observe their "detriment" is the same whether the governments compelled them to initially incur the response costs, or performed the cleanup themselves and then sued petitioners for damages for reimbursement.

We conclude, however, that "damages" is not as clearly read as petitioners would have it, and is subject to two reasonable interpretations of its ordinary plain meaning. The primary source of ambiguity is the obvious fact that "damages because of injury to or loss, destruction or loss of use of property" could mean damages at law or equitable monetary relief designed to correct the damage to property. From the standpoint of the lay insured, "damages" could well include any sum expended under sanction of law, including both money damages and sums paid out to an injured party in response to its claim for equitable relief. Even a federal CERCLA decision supporting real parties, a case discussed *infra,* seems to agree with this conclusion. (*Continental Ins.* v. *Northeastern Pharmaceutical* (8th Cir. 1988) 842 F.2d 977, 985, cert. den. 488 U.S. 821 [102 L.Ed.2d 43, 109 S.Ct. 66].) Since the insured purchased insurance for property damage resulting from its negligent conduct, the ambiguity is enhanced: the insured may reasonably expect coverage for any sums expended, either at law or equity, as a result of the insured's causing property damage to another. The insured could thus reasonably conclude it was covered for environmental cleanup costs, imposed upon it by the government to remedy and prevent property damage, as well as traditional legal damages.

This conclusion finds support in California law, particularly *Globe Indem. Co.* v. *State of California, supra,* 43 Cal.App.3d 745.[5] In *Globe,* the insureds negligently caused a fire which spread to adjacent property. The

[5] The conclusion is also amply supported in *Intel Corp.* v. *Hartford Acc. and Indem. Co.* (N.D.Cal. 1988) 692 F.Supp. 1171, relied upon by petitioners, which applied California's law of insurance contract interpretation and concluded that CERCLA response costs were "damages" under a CGL policy. During the pendency of this petition, however, the *Intel* decision was appealed to the Ninth Circuit. We accordingly do not discuss or rely upon the *Intel* decision in this opinion.

state sued the insureds to recoup its costs of suppressing the fire. The insureds argued the fire suppression costs were covered under their CGL policy insuring them for " 'all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . .' " (*Id.,* at pp. 748-749.) The court found an ambiguity whether fire suppression costs, which can only be incurred once there is damage to property by fire, can constitute damages payable "because of" property damage. The court reasoned that since such costs must be preceded by actual damage, and are "expended to prevent further damage to tangible property," one could reason that "the insureds became legally obligated to pay these fire suppression costs *because of* damage to tangible property." (*Id.* at p. 751, italics in original.)

The *Globe* court resolved the ambiguity by interpreting the policy in light of the reasonable expectations of the parties regarding the scope of coverage. "When an insured takes out an indemnity policy, as in this case, it is more reasonable to suppose that he expects to be protected by his insurance in any situation wherein he becomes liable for damage to tangible property. It would seem strangely incongruous to him, as it does to us, that his policy would cover him for damages to tangible property destroyed through his negligence in allowing a fire to escape but not for the sums incurred in mitigating such damages by suppressing the fire." (*Globe Indem. Co.* v. *State of California, supra,* 43 Cal.App.3d at p. 751.)

Real parties argue that *Globe* is limited to an emergency situation in which there is no time to seek the insurer's consent to incur mitigation costs. This claim is based in part on an issue not before either this court or the trial court, an argument that the policy does not cover expense of the insured incurred without the insurer's consent. In any case, real parties read too much into the *Globe* opinion, and at the same time have read too little: "A rule, reasonably applied, permitting expenses incurred in the mitigation of damages to tangible property to be recoverable under policies insuring against liability incurred because of damages to tangible property *would seem to require universal application as it encourages a most salutary course of conduct.*" (*Globe Indem. Co.* v. *State of California, supra,* 43 Cal.App.3d at p. 752, italics added.)[6]

Under a *Globe* analysis, petitioners could reasonably expect that funds expended to correct third party property damage caused by pollution, and to mitigate the effects of that damage, are covered by their CGL policies. Their pollution has damaged the groundwater and river water of the state

---

[6] Real parties also suggest that *Globe* only applies when coverage is undisputed, so that the insurer who denies coverage may escape liability. To state such an argument is to refute it.

and federal governments; petitioners could reasonably believe that the governments' detriment would be recompensed by a payment of damages. (Cf. Civ. Code, § 3281.) The fact that the damages do not take the form of a traditional damage award in an action at law is not determinative of the insureds' reasonable expectation of coverage.

Petitioners have become legally obligated to clean up their pollution by virtue of the polite but puissant compulsion of CERCLA. At least to the reasonable insured, this obligation is no less a legal sanction than that of a monetary judgment. Indeed, having purchased insurance to cover them for damages because of property damage, petitioners would be surprised indeed to learn that coverage depended on whether the proceeding employed to obtain recompense was defined as "legal" or "equitable." An insured reading the coverage clause before us would reasonably conclude it provided coverage for any economic outlay compelled by law to rectify and mitigate property damage caused by the insured's pollution. To phrase it another way, persons purchasing a comprehensive general liability policy which promises "to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or loss, destruction or loss of use of property" would reasonably expect to be insured if their negligence caused injury to or loss, destruction or loss of use of [another's] property. It would come as an unexpected, if not incomprehensible, shock to the insureds to discover that their insurance coverage was being denied because the plaintiff chose to frame his complaint in equity rather than in law.

Real parties maintain, however, that the government suits plainly seek only equitable relief and that "damages" is an unambiguous term limited to an action at law. Real parties contend that "damages" must restrict the meaning of the preceding phrase, "all sums which the insured shall become legally obligated to pay," such that "damages" necessarily limits coverage to a legal damage award. This textual argument does not directly address the definitional ambiguity of "damages." Moreover, in making the argument real parties effectively sunder "damages" from the additional restrictive phrase "because of injury to or loss, destruction or loss of use of property." Indeed, at oral argument real parties went so far as to contend that the coverage clause actually ended at the word "damages," and the "because of . . ." phrase was a separate "property damage clause." This argument is as much a sophistry as a transparent attempt to persuade us to ignore our responsibility to interpret the coverage clause as a whole. (See Civ. Code, § 1641 [contract must be viewed as a whole and effect given to every part].) The term "damages" does not stand by itself in a vacuum, but is the keystone of the operative phrase "all sums which the insured shall become legally obligated to pay as damages because of injury to or loss,

destruction or loss of use of property." The *Globe* court found the "because of . . ." phrase reinforced the insured's reasonable expectation of coverage for environmental cleanup costs. In short, real parties cannot seek a declaration of their responsibility under the coverage clause by asking the court to ignore the operative language of the clause itself.

Real parties also contend there can be no "damages" under the policy because the government suits do not allege property damage. (For the purpose of this argument, real parties seem to reverse their position that the "damages" and the "property damage" segments of the coverage clause are severable.) With regard to the state and federal CERCLA complaints, real parties contend the suits are not for damages, but simply an exercise of police power. We defer discussion of this point to part II(C) below. ▉ With regard to the two state complaints, real parties claim there are no "damages" involved because the state cannot sue for "damages" as would a traditional, fee-simple-absolute property holder. Real parties assert that the concept of public ownership of water, presumably because limited to rights of use and regulation, is a "19th-century fiction." The short answer to this contention is that real parties did not challenge the state's standing below, and should not be permitted to do so now. However, since we conclude real parties are mistaken and the issue could arise again, we resolve it here.

▉ In this state, all ownership of water is usufructuary; water rights decisions "do not speak of the ownership of water, but only of the right to its use." (*United States* v. *State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 100 [227 Cal.Rptr. 161], citations omitted.) ▉ The state's property interest in groundwater, as established by Water Code section 102 (see fn. 1, *supra*) is no less usufructuary than that of private ownership, and public waters may be duly used, regulated and controlled in the public interest. (See *National Audubon Society* v. *Superior Court, supra,* 33 Cal.3d at p. 441; *Meridian, Ltd.* v. *San Francisco* (1939) 13 Cal.2d 424, 445 [90 P.2d 537].) ▉ The state's public trust interest in the navigable portions of the American River is similarly sufficient for standing to claim damages caused by environmental pollution. (*National Audubon Society* v. *Superior Court, supra,* at pp. 445-448.)

Unquestionably, the state and federal governments are third party property owners for purposes of insurance coverage. Pollution of the ground and river waters is damage to public property, as well as a direct injury to public welfare. (See *Port of Portland* v. *Water Quality Ins. Syndicate* (9th Cir. 1986) 796 F.2d 1188, 1193-1194.) Indeed, even real parties' authorities note the great weight of authority holding environmental contamination to be

"property damage." (See *Continental Ins.* v. *Northeastern Pharmaceutical, supra,* 842 F.2d at pp. 983-984.)[7]

 Real parties further argue that CERCLA cleanup costs are "restitutionary" in nature, and that several California cases hold that restitutionary payments are not "damages" in the insurance context. (See *Hackethal* v. *National Casualty Co.* (1987) 189 Cal.App.3d 1102 [234 Cal.Rptr. 853]; *Jaffe* v. *Cranford Ins. Co.* (1985) 168 Cal.App.3d 930 [214 Cal.Rptr. 567]; *Nationwide Ins. Co.* v. *King* (S.D.Cal. 1987) 673 F.Supp. 384; see also *United Pacific Ins. Co.* v. *Hall* (1988) 199 Cal.App.3d 551 [245 Cal.Rptr. 99]; *State Farm Fire & Cas. Co.* v. *Superior Court* (1987) 191 Cal.App.3d 74 [236 Cal.Rptr. 216].)

Real parties place far too much weight on the broad assertion that CERCLA cleanup costs are restitutionary. True, the federal decisions construing CERCLA describe suits seeking response costs as involving equitable relief. (*Maryland Cas. Co.* v. *Armco, Inc.* (4th Cir. 1987) 822 F.2d 1348, 1351, cert. den. (1988) 484 U.S. 1008 [98 L.Ed.2d 654, 108 S.Ct. 703]; see *United States* v. *Northeastern Pharmaceutical* (8th Cir. 1986) 810 F.2d 726, 749, cert. den. (1987) 484 U.S. 1008 [98 L.Ed.2d 102, 108 S.Ct. 146]: "When the government seeks recovery of its response costs under CERCLA . . . it is in effect seeking equitable relief in the form of restitution or reimbursement of the costs it expended in order to respond to the health and environmental danger presented by hazardous substances.")

But the equitable nature of CERCLA relief begins, not ends, the inquiry into the reasonable expectation of the insured regarding coverage. Especially where, as here, the insured does not simply reimburse the government for its response costs, but incurs a direct out-of-pocket economic detriment for the response costs in the first instance, the question is not whether the action or the relief sought is equitable or legal, but whether the insured has a reasonable expectation that such costs are insured as "damages because of injury to or loss, destruction or loss of use of property."[8] The insured who

---

[7] Real parties also claim that petitioners, in their pleadings in the government lawsuits and elsewhere, have denied they had caused property damage by pollution. Evidently we are asked to adopt a rule that whenever an insured denies liability to a third party, its insurance company may deny coverage. We need not further discuss this novel concept, as the alleged denials were contained in documents stricken from the record by the trial court.

[8] California has long dispensed with the distinction between legal and equitable actions (Code Civ. Proc., § 30), but retains a distinction, at least for some purposes, between legal and equitable relief. The distinction, however, seems to be blurred: " 'In reality the distinction between the two classes of remedies is more or less arbitrary and groundless. It is well said also that the courts of equity are reaching into new fields of operation and the courts of law are encroaching upon the former territory of the courts of equity.' " (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 77, p. 105, quoting *Philpott* v. *Superior Court* (1934) 1 Cal.2d 512, 515 [36 P.2d 635, 95 A.L.R. 990].) It is interesting to note that Professor Witkin de-

has caused damage to another's property by pollution, and who is required under compulsion of CERCLA to incur response costs to clean up the damage by restoring the polluted areas to their prepolluted condition, or to reimburse the injured party for its costs in doing so, may reasonably expect that its insurance for property damage will cover those costs.

This is especially true because CERCLA response costs, while arising from an essentially equitable proceeding, may not in effect be restitutionary. In its typical sense, restitution is the return of something wrongfully received. Response costs, whether incurred directly by the polluter or paid to reimburse the government for its cleanup efforts, do not fit easily into this definition. Furthermore, the cost of restoration of property to its undamaged condition is one measure of compensatory property damages. (*Geddes & Smith, Inc.* v. *St. Paul Mercury Indem. Co.* (1965) 63 Cal.2d 602, 604-605 [47 Cal.Rptr. 564, 407 P.2d 868]; *Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 801-802 [171 Cal.Rptr. 334]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 919, p. 3204; see *United States Aviex Co.* v. *Travelers Ins. Co.* (1983) 125 Mich.App. 579 [336 N.W.2d 838, 843] ["The damage to the natural resources is simply measured in the cost to restore the water to its original state."].

Nothing in the five decisions cited by real parties (see p. 230, *ante*) compels a different conclusion.[9] *State Farm* and *United Pacific* hold only that there is no coverage for "damages" in criminal or juvenile proceedings where "damages" are not sought. *Jaffe* involved a criminal prosecution of a doctor for Medi-Cal overcharges. Jaffe argued that his insurance policy covered a suit for civil restitution of the overpayments brought under Welfare and Institutions Code sections 14170 et seq. The court noted this posed a classic restitutionary scenario: "The defendant is asked to return something he wrongfully received; he is not asked to compensate the plaintiff for injury suffered as a result of his conduct." (*Jaffe* v. *Cranford Ins. Co., supra,* 168 Cal.App.3d at p. 935.) The court thus concluded that "payments of a restitutionary nature, if sought by the state pursuant to [Welfare and Institutions Code] sections 14170 et seq., are not 'damages' within the meaning of Jaffe's policy." (*Ibid.,* fn. omitted.) The restitution sought from Jaffe was

scribes quasi-contract and tort actions for restitution as being generally ones at law. (*Id.,* §§ 88, 120, pp. 116, 150-151; see *id.,* § 82, pp. 108-109.)

[9] Real parties also maintain that Insurance Code section 533.5, subdivision (a), enacted in 1988, bars coverage. The statute provides, in part, that "[n]o policy of insurance shall provide, or be construed to provide, any coverage or indemnity for the payment of any fine, penalty or restitution in any civil or criminal action or proceeding brought by the Attorney General, any district attorney, or any city prosecutor . . . ." In our view this statute is inapplicable to the payment of CERCLA response costs, which are not restitution in the normal sense of the term. Petitioners do not contend that the policies cover fines or penalty payment.

within the definition of the return of something wrongfully received, while the response costs at issue in this case are not. *Jaffe* is limited to its particular facts and is of little pertinence to the interpretation of the coverage clause herein against the statutory backdrop of CERCLA.

*Hackethal* is even less apposite. It concerned a policy of income reimbursement for attendance at a " 'trial of a civil suit for damages against the insured alleged to have been caused by malpractice.' " (*Hackethal v. National Casualty Co., supra,* 189 Cal.App.3d at pp. 1104-1105, italics omitted.) The court held the policy did not apply to a Board of Medical Quality Assurance administrative hearing because it was not a suit for damages, even though Dr. Hackethal was "damaged" by the resultant license suspension. Finally, *Nationwide* only holds that there is no coverage for "damages" for a suit seeking an injunction for the removal of an air conditioner for violation of condominium restrictions. Obviously, there was no issue in that case of property damage and any sums expended "because of" that damage.

■ We thus conclude that "damages because of injury to or loss, destruction or loss of use of property" is ambiguous with regard to response costs, and that the ambiguity must be construed against the insurer to maximize the scope of reasonably expected coverage. (*Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d at p. 807; *Insurance Co. of North America* v. *Sam Harris Constr. Co., supra,* 22 Cal.3d at pp. 412-413.)

C.

A review of federal and sister-state authority deciding the response costs issue under CERCLA shows that the great weight of authority is consistent with our decision. Real parties, however, rely heavily on two circuit court decisions applying the laws of Maryland and Missouri, which have held that response costs are not damages: *Maryland Cas. Co.* v. *Armco, Inc., supra,* 822 F.2d 1348, and *Continental Ins.* v. *Northeastern Pharmaceutical, supra,* 842 F.2d 977.

In *Armco,* the Fourth Circuit held that a suit under CERCLA for injunctive relief and reimbursement of remedial costs was not a claim for "damages" under a CGL policy. However, *Armco* was a diversity case decided under Maryland law which, unlike California, "adopt[s] the somewhat narrow, technical definition of damages." (*Maryland Cas. Co.* v. *Armco, Inc., supra,* 822 F.2d at p. 1352.) The definition used by the court was taken from *Aetna Casualty and Surety Company* v. *Hanna* (5th Cir. 1955) 224 F.2d 499, 503: damages includes "only payments to third persons when those persons have a legal claim for damages." *Hanna* is a non-CERCLA case

applying Florida law to an insured seeking coverage for costs and expenses incurred in responding to a mandatory injunction. It is not clear why the *Armco* court turned to a 30-year-old case for a definition of "damages," a definition which is essentially a tautology defining damages as payment to a person who has "a legal claim for damages." In any event, following its narrow "damages" definition under Maryland law, the *Armco* court concluded that CERCLA costs were not legal damages, but sums arising from equitable relief. The court also expressed the opinion that insurance policies should not be construed to cover "essentially prophylactic" or "harm-avoidance" measures, as opposed to "damages arising from actual, tangible injury." (*Maryland Cas. Co.* v. *Armco, Inc., supra,* at p. 1353.)

In *Continental,* the Eighth Circuit reached a similar result, but only in a sharply divided en banc decision. The majority applied the law of the forum state, Missouri, which provided for an ordinary, plain meaning construction of insurance policies. (*Continental Ins.* v. *Northeastern Pharmaceutical, supra,* 842 F.2d at p. 985.) The majority then noted that "outside the insurance context," the term "damages" was ambiguous and could encompass legal damages or equitable monetary relief. "[F]rom the viewpoint of the lay insured, the term 'damages' could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses." (*Ibid.*) Inexplicably, the majority then concluded that in the context of insurance the term "damages" was *not* ambiguous and was limited to traditional legal damages. The majority relied primarily on *Armco* and *Hanna,* decisions espousing a narrow, technical definition of damages. The majority also relied on several non-CERCLA cases which hold that the costs of compliance with an injunction have generally not been considered "damages" in the insurance context. (*Id.,* at p. 986, and cases cited therein.)

As was the *Armco* court, the *Continental* majority was concerned that absent a limited definition of damages, " 'all sums which the insured shall become legally obligated to pay *as damages*' " would be reduced to " '*all sums* which the insured shall become legally obligated to pay.' " (*Continental Ins.* v. *Northeastern Pharmaceutical, supra,* 842 F.2d at p. 986, italics in original.) "The expansive reading of the term 'damages' urged by the state would render the term 'all sums' virtually meaningless. 'If the term "damages" is given the broad, boundless connotations sought by the [insured], then the term "damages" in the contract . . . would become mere surplusage, because any obligation to pay would be covered. . . .' " (*Ibid.,* italics omitted, quoting *Maryland Casualty Co.* v. *Armco, supra,* 822 F.2d at p. 1352.)

The dissent in *Continental* noted that Missouri law, like California's, requires a reasonable-layperson construction of insurance policies. Under that construction "damages" should have been read to include cleanup

costs. The dissent sharply criticized the majority for following *Armco*'s technical-meaning rule and ignoring Missouri law: "[T]he majority rejects the dictionary definition of 'damages' on the ground that in the insurance context the word has a technical meaning which does not include the cost of restoring real property to the predamage condition. While this may be justified under the law of some states, it certainly is not under Missouri law. The legal definition of 'damages' under Missouri law . . . includes the cost of restoring real property to its pre-damaged condition." (*Continental Ins.* v. *Northeastern Pharmaceutical, supra,* 842 F.2d at p. 988, citation omitted (dis. opn. of Heaney, J., Lay, J. & Fagg, J.) "If the insurer wished to use a technical legal meaning for [damages] which differed from the accepted dictionary definition, it should have explicitly done so." (*Ibid.*) The dissent also argued that *Hanna,* the intellectual keystone of the *Armco* decision, "is of doubtful applicability." (*Id.,* at p. 989.) *Hanna* simply held that under Florida law, which did not provide for damages for restoration of property to its predamaged state, there was no insurance coverage for an injunction directing the defendant to restore the property. (*Ibid.*)

In addition to *Armco* and *Continental,* real parties rely on *Cincinnati Ins. Co.* v. *Milliken and Co.* (4th Cir. 1988) 857 F.2d 979; *Travelers Ins. Co.* v. *Ross Elec. of Washington, Inc.* (W.D.Wash. 1988) 685 F.Supp. 742; and *Verlan, Ltd.* v. *John L. Armitage & Co.* (N.D.Ill. 1988) 695 F.Supp. 950. All three of these decisions rely exclusively, and somewhat uncritically, on *Armco* and the *Continental* majority opinion.

The reasoning of both *Armco* and the *Continental* majority opinions is based on rules of interpretation or construction adverse to California law, and thus should not be considered persuasive. *Armco* is based on a technical definition of damages apparently required under Maryland law, and *Continental* follows such a definition in derogation of the reasonable layperson test proper under the forum-state law under review. Both cases argue that a broader construction of "damages" would render the term surplusage, requiring coverage of essentially any obligation to pay. As discussed above, a construction of "damages" which includes sums connected with equitable relief is not a boundless universe—such "damages" still must be "because of" property damage. Thus, *Armco*'s conclusion that an insurer would be held liable for prophylactic safety measures, taken in advance of any damage to property, is not applicable to the policies under review. Neither is real parties' extrapolation that the insurer would be liable for the costs of compliance with government safety regulations, such as OSHA regulations, rules requiring fire extinguishers, protective clothing, and the like. Such prophylactic costs are not incurred "because of injury to or loss, destruction or loss of use of property" for the simple reason that no property damage has yet occurred, and such costs are ordinary business expenses. At oral

argument, petitioners made it clear that they are not seeking coverage for such items.

Finally, real parties contend that damages cannot be claimed in the CERCLA actions because the governments have not sued under a CERCLA provision for recovery of damages to natural resources. The suits seek liability under 42 United States Code section 9607(a)(4)(A), which provides that the polluter shall be responsible for response costs. Section 9607(a)(4)(C) of 42 United States Code provides a separate basis of liability for "damages for injury to, or destruction of, or loss of natural resources, . . ." The statutory distinction between response costs and natural resources damages, however, does not alter the reasonable expectation of the insured that cleanup costs are "damages." (*Continental Ins.* v. *Northeastern Pharmaceutical, supra,* 842 F.2d at pp. 989-990 (dis. opn. of Heaney, J., Lay, J. & Fagg, J.) ▇▇ The distinction is not entirely clear: "While CERCLA provides separate claims for recovery of costs incurred for 'remedial action,' and for damage to natural resources, it can be expected that there is a great deal of overlap between the two." (*United States* v. *Shell Oil Co.* (D.Colo. 1985) 605 F.Supp. 1064, 1084-1085, fn. 10, citations omitted.) Both may involve the restoration of polluted property to its previously uncontaminated state. The costs of contamination and restoration may be a measure of "natural resource damages" under CERCLA. (*State of Idaho* v. *Bunker Hill Co.* (D.Idaho 1986) 635 F.Supp. 665, 675-676.) ▇▇ As the *Continental* dissent concluded, it is not unreasonable for the layperson to expect that restorative response costs are insured.

Numerous federal and sister-state decisions reject *Armco* and *Continental* or otherwise favor petitioners' position. The dissent in *Continental* (which is consistent with the original panel opinion, 811 F.2d 1180) notes that "the cases applying state law requiring the words in an insurance policy to be given their ordinary, non-technical meaning support" the dissent's position. (*Continental Ins.* v. *Northeastern Pharmaceutical, supra,* 842 F.2d at p. 990.)

In *Port of Portland* v. *Water Quality Ins. Syndicate, supra,* 796 F.2d 1188, although the main issue was whether an oil spill constituted "property damage," the court concluded "that discharge of pollution into water causes damage to tangible property and hence cleanup costs are recoverable under a property damage liability clause." (*Id.,* at p. 1194.) In *New Castle County* v. *Hartford Acc. and Indem. Co.* (D.Del. 1987) 673 F.Supp. 1359, the district court noted that Delaware law required an " 'ordinary, usual meaning' " interpretation of insurance policies. (*Id.,* at p. 1365, quoting *Johnston* v. *Tally Ho, Inc.* (Del.Super.Ct. 1973) 303 A.2d 677, 679.) Since the dictionary definition of damages does not distinguish between actions in law and equity, the CERCLA claims for injunctive and other equitable

relief—including cleanup costs—were covered as "damages" under a CGL policy. The claims "involve costs that the [insured] may become 'legally obligated to pay' as a result of injuries sustained by the respective [p]laintiffs or compensation imposed by law for a wrong." (*Id.*, at pp. 1365-1366.)

In an oft-cited decision, *United States Aviex Co.* v. *Travelers Ins. Co., supra,* 336 N.W.2d 838, the Michigan Court of Appeals rejected *Hanna* and its cognate cases as interpreting "damages" too narrowly. "If the state were to sue in court to recover in traditional 'damages', including the state's costs incurred in cleaning up the contamination, for the injury to the ground-water, [the insurer's] obligation to defend against the lawsuit and to pay damages would be clear. *It is merely fortuitous from the standpoint of either [the insured] or [the insurer] that the state has chosen to have [the insured] remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing [the insured] to recover those costs.* The damage to the natural resources is simply measured in the cost to restore the water to its original state." (*Id.*, at p. 843, citations omitted, italics added.)

In *Fireman's Fund Ins. Companies* v. *Ex-Cell-O Corp.* (E.D.Mich. 1987) 662 F.Supp. 71, 75, the court was more succinct: "[C]overage does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder." The district court relied on the emphasized language of *United States Aviex* above and concluded "'damages' include money spent to clean up environmental contamination." (*Ibid.*) Relying on both *United States Aviex* and *Fireman's Fund,* the Eastern District of Pennsylvania reached the same result. (*Centennial Ins. Co.* v. *Lumbermens Mut. Cas. Co.* (E.D.Pa. 1987) 677 F.Supp. 342; accord, *Independent Petrochem. Corp.* v. *Aetna Cas. & Sur.* (D.D.C. 1986) 654 F.Supp. 1334; *Gloucester Tp.* v. *Maryland Cas. Co.* (D.N.J. 1987) 668 F.Supp. 394.)

Finally, in *Broadwell Realty* v. *Fidelity & Cas.* (N.J.Super.Ct.App.Div. 1987) 528 A.2d 76, the court held the insurer was liable to pay as damages government-mandated cleanup costs, on the ground that the costs represented a legal obligation owing because of property damage. (*Id.*, at p. 81.) The court reasoned that the mere fact the cleanup costs were incurred by the insured to comply with a cleanup order, and were not damages paid to a third party, was not enough to prevent coverage. "The insured's expenditures were made to discharge its legal obligation to the [New Jersey Department of Environmental Protection] or, at the very least, to prevent what would have been an avoidable legal obligation to pay damages to a third party. The expenses were incurred by virtue of the *in terrorem* and coercive effect of the [Department's] directive. The harm to the State, by reason of the discharge of pollutants into its streams, and to others was continuing

and ongoing. . . . Under these circumstances, the [cleanup] expenses constituted 'damages' which Broadwell was legally obliged to pay." (*Id.,* at p. 82.)

These decisions render a broader interpretation of "damages" consistent with the reasonable expectations of the insured. The insured expects to be covered for sums expended as a result of a legal obligation, regardless of whether the nature of that obligation is legal or equitable. This is especially true when the sums are expended to remedy pollution-caused property damage. Such sums are expended because of the polluter's obligation to the government to conduct cleanup operations, and are thus a legal obligation to pay "because of" property damage. (Moreover, as the *Continental* dissent noted, the insurance companies are free to rewrite their policies to cure the ambiguity surrounding the word "damages.")

The interpretation of the coverage clauses under review to encompass cleanup costs is also supported by sound public policy. The California Attorney General, appearing as amicus curiae for petitioners, posits that if an insured polluter knows it is covered for cleanup costs, cleanup activities will be conducted sooner and with greater cooperation with government. Thus, in the long run insurance coverage would seem to enhance the quality of environmental protection.

### III.

We concur with the majority of reported decisions that response costs incurred under CERCLA and Water Code section 13304 are "damages because of injury to or loss, destruction or loss of use of property damage" within the meaning of the CGL coverage clauses at issue. We have reached this conclusion without benefit of a specific factual record of the exact nature and scope of petitioners' response costs in this particular case. We thus qualify our holding with the caveat that not all of petitioners' economic outlays may be considered "damages." ██ ██ While the CERCLA definition of "response costs" is broad enough to include costs incurred to prevent threatened *future* pollution where none has yet occurred, those response costs covered as damages must be those in the subset of costs incurred "because of" property damage. Undoubtedly, some portion of the response costs in this case will be covered as "damages," because they will constitute legally compelled expenses for the cleanup of extant pollution. The consent decree might, however, require an expenditure to prevent future pollution of a type which has not yet occurred, or to prevent pollution from a source which has not yet caused pollution. These costs would not be causally related to property damage and would therefore not be covered as "damages" under the policies.

This is illustrated by the following hypothetical: Petitioners have two underground storage tanks for toxic waste. Tank #1 has leaked wastes into

the soil which have migrated to the groundwater or otherwise polluted the environment. Tank #2 has not leaked, but government inspectors discover that it does not comply with regulatory requirements, and could eventually leak unless corrective measures are taken. Response costs associated with Tank #1 will be covered as damages, because pollution has occurred. Tank #2 would not be covered. Likewise, the expense of capital improvements to prevent pollution in an area of a facility where there is none, or improvements or safety paraphernalia required by government regulation and not causally related to property damage, would not be covered as "damages." The exact nature of the response costs, as embodied in the consent decree, will no doubt be established at trial of the declaratory relief action below.

To summarize, petitioners purchased CGL policies protecting them in the event their insured conduct caused injury to or loss, destruction or loss of use of another's property. The government lawsuits contend that such events transpired. To that extent, petitioners are entitled to rely on their policies for protection.

### IV.

The superior court erred in granting real parties' motion for summary adjudication. Accordingly, petitioners are entitled to an extraordinary writ to vacate the order granting real parties summary adjudication of issues.

Let a peremptory writ of mandate issue commanding respondent Superior Court of San Mateo County to vacate its order granting summary adjudication of issues, and to enter in its place a new and different order denying said motion.

Low, P. J., and King, J., concurred.

A petition for a rehearing was denied on May 18, 1989, and the following opinion was then rendered:

THE COURT.*—Real parties in interest petition for rehearing contending we have omitted or misstated material facts in our opinion filed April 19, 1989. We have reviewed the allegations of the petition and have found them without merit. We deny the petition for rehearing and add the following comments.

There has been considerable confusion in this case over the role played by the extrinsic evidence in the trial court. Although some extrinsic evidence was presented below, it was entirely stricken on cross-motions to strike and the trial court resolved the question as a matter of law. When this was

---

*Before Low P. J., Haning, J., and King, J.

drawn to real parties' attention at oral argument, they responded only that one piece of extrinsic evidence, a letter allegedly denying a previous insurance claim, was not stricken. Real parties, however, were mistaken, and in footnote 3 of our opinion we accurately discuss the role and the fate of extrinsic evidence in this case. In the petition for rehearing real parties argue that "the trial court's ruling on Aerojet's objections and motion to strike was limited to striking the evidence in real parties' *reply*. [¶] At no point in the record is there a ruling by the trial court striking the evidence submitted with the original motion."

Aside from the fact that the current contention is broader than real parties' response at oral argument, we cannot agree with real parties' interpretation of the record. Real parties accompanied their motion for summary adjudication with numerous items of purported extrinsic evidence. These items were not cited as supportive evidence of either of the two material facts set forth in real parties' separate statement of material facts. Indeed, real parties took pains to note again and again that the motion posed only a legal question of insurance contract interpretation; for instance, real parties stated that the motion "presents a legal issue that depends only on the plain meaning of the insurance policies." The motion suggested the factual matters were not necessary to resolve the legal issue, and were presented only for "context." In its opposition to the summary judgment motion, Aerojet attached numerous items of purported extrinsic evidence. In their reply brief, real parties presented additional evidentiary items.

Aerojet filed a motion to strike the purported evidence submitted in support of *both* the motion for summary adjudication and the reply brief. Aerojet's motion was made "on the ground that the material sought to be stricken does not relate to the issues or to the allegedly undisputed facts set forth in [real parties'] Separate Statement [of Material Facts], and, in the case of evidentiary materials, is not listed in said Separate Statement as supporting evidence, all in violation of the applicable statute and Rules of Court." The motion to strike was *not* limited to the reply brief and was *not* made on the ground that any extrinsic evidence should have been presented with the original motion. Real parties filed their own motion to strike several factual assertions of Aerojet's opposition brief as well as its supporting extrinsic evidence.

At the hearing on the motion for summary adjudication, the trial court stated: "Now, moving on through the objections and the motion [*sic*] to strike certain evidence. I don't know which order they came in but I've looked at them both being as far as Chesire's, the way I understand, the evidence that [Aerojet is] objecting to is in the reply memorandum which would not be proper *and I would sustain it*. And it would not enter into my decision on the motion. [¶] As to [real parties' counsel's] objection to Aero-

jet's, I would grant it be stricken. I see no relevance in that in the way I have determined and read the case and the motion that is before me." (Italics added.)

It is clear, especially from the court's later ruling denying a motion for reconsideration, that the trial court considered the question one of law. This is the only evident basis for the trial court's granting in its entirety real parties' motion to strike, which targeted Aerojet's extrinsic evidence, with the last sentence of the quoted passage. Although the court suggested its "understanding" of Aerojet's objections as speaking to the reply only, the court's ruling "and I would sustain it" clearly sustained the objections in their entirety. Curiously, real parties neither sought clarification that their original-motion evidence was still in the case nor focused on that evidence in the ensuing argument on the issue of law raised by the motion. In light of these circumstances, and the parties' obvious understanding, shared by the court, that the issue was purely a question of law, we think it clear the extrinsic evidence played and continues to play no role in this case, and we adhere to the phrasing of our opinion.

We also comment on an argument raised in the petition for rehearing concerning the coverage clause. As noted in our opinion, real parties contended at oral argument that the coverage clause actually ended at the word "damages" and the ensuing "because of . . ." phrase was a separate "property damage clause." Having suffered defeat in the writ proceeding real parties now urge in their petition for rehearing that "[r]eal parties did not and do not make that contention." This claim is wholly inaccurate. Real parties, having made the contention, may not now deny it to suit their present needs. One may not alter one's appellate argument as the chameleon does his color, to suit whatever terrain one inhabits at the moment.

Low, P. J., and King, J., concurred.

A petition for a rehearing was denied May 18, 1989, and the petition of real parties in interest for review by the Supreme Court was denied August 10, 1989. Panelli, J., was of the opinion that the petition should be granted.