[No. B011223. Second Dist., Div. Three. Feb. 26, 1987.]

CLEMENS A. HACKETHAL, Plaintiff and Appellant, v.
NATIONAL CASUALTY COMPANY et al., Defendants and Appellants.

COUNSEL

John C. McCarthy for Plaintiff and Appellant.

Breidenbach, Swainston, Crispo & Way, Gary A. Hamblet, Maria L. Cousineau and Margaret E. Durk for Defendants and Appellants.

OPINION

ARABIAN, J.—

### INTRODUCTION

This case involves a question of first impression: Does an insurance policy which promises to reimburse an insured physician for his expense and loss of earned income "for each day the insured is required to attend *the trial*

*of a civil suit for damages against the insured* alleged to have been caused by malpractice" provide such coverage for a hearing before the Board of Medical Quality Assurance (BMQA) which the insured is required to attend? We hold that it does not.

Plaintiff, appellant and cross-respondent Dr. Clemens A. Hackethal (Dr. Hackethal) brought an action against defendants, respondents and cross-appellants National Casualty Company (National), an insurance company, and Frank B. Hall & Company (Hall), formerly Nettleship Company (Nettleship), insurance brokers,[1] for deceit, and against National only, for bad faith refusal to pay benefits due under an income reimbursement insurance policy.[2]

The jury rendered a verdict in favor of Dr. Hackethal and against National in the amounts of $5,000 for insurance benefits; $25,000 for emotional distress; and $100,000 for punitive damages; and rendered a verdict in favor of Dr. Hackethal and against Hall in the amount of $5,000 for economic losses. Judgment on the verdicts was entered.

Thereafter, the trial court granted National's motion for judgment notwithstanding the verdict as to the jury's award to Dr. Hackethal of $25,000 for emotional distress and conditionally granted National's and Hall's motion for a new trial unless Dr. Hackethal agreed to a reduction of the judgment to $5,000 for compensatory damages, the face amount of the policy, and to $25,000 for punitive damages.

Dr. Hackethal refused to remit any portion of the award and appealed from the judgment notwithstanding the verdict on the emotional distress issue and from the trial court's order granting National and Hall a new trial on the other issues. National and Hall cross-appealed from the judgment as originally entered.

We hold that, as a matter of law, National and Hall may not be held liable for deceit and that Dr. Hackethal was not entitled to coverage under the terms of the National policy. Therefore, we reverse the judgment on the verdicts in favor of Dr. Hackethal and against National and Hall; and we dismiss as moot Dr. Hackethal's appeal from the judgment notwithstanding the verdict on the emotional distress issue and from the new trial order.

---

[1] The Nettleship Company was purchased by Frank B. Hall & Company in 1973.
[2] Dr. Hackethal dismissed causes of action for declaratory relief and for intentional interference with property interest.

## CONTENTIONS ON CROSS-APPEAL[3]

On cross-appeal National and Hall contend: 1. The trial court erred in denying National's motion for a directed verdict on the question of coverage.

2. The trial court erred in denying National's and Hall's motions for directed verdicts on the issue of fraud.

3. The trial court erred in denying National's motion for directed verdict on the issue of punitive damages.

## FACTS

Since 1959, National has marketed an insurance policy called "Defendants Reimbursement Policy." In 1968, during the "malpractice crisis," it sold the policy to Dr. Hackethal, through Nettleship, Hall's predecessor company.

### Promotional Brochure.

The brochure published by Nettleship to promote the policy states that the policy will pay its insured $200 "for each full day spent in court as a defendant" and that it will "cover any suit . . . involving either professional acts or automobiles . . . ." The brochure notes: "The need for this insurance is becoming more readily apparent as suits against doctors continue to increase." One of the front panels of the brochure admonishes: "Protect yourself from loss of income with a DEFENDANTS REIMBURSEMENT POLICY up to $5,000.00 PER TRIAL only $30.00 a YEAR." At a prominent place on the brochure is the following caveat: "*This brochure briefly outlines the insurance plan. Complete details and provisions of the insurance are contained in the policy.*" (Italics added.)

### The Agent's Representations.

Dr. Hackethal testified that the Nettleship agent approached him about purchasing the "Defendants Reimbursement Policy," told him that "45 percent of all California doctors are being sued" and asked him "what happens to your office and your income if you are out of the office?" Dr.

---

[3]On appeal Dr. Hackethal contends: 1. The trial court erred in granting judgment in favor of National notwithstanding the verdict assessing emotional distress damages against National in the amount of $25,000, because the court applied an erroneous legal test in determining there was no substantial evidence to support the verdict.

2. The trial court abused its discretion in granting National's and Hall's motions for new trial on all issues on the grounds of excessive punitive damages, because the court's specification of reasons is inadequate and not supported by substantial evidence and by law.

Hackethal said he never thought about it and the agent responded, "here is an insurance policy that takes care of that." Dr. Hackethal remembered the agent said the policy would cover any suit filed against him, even on matters other than malpractice, and said he would be covered by the policy even if he were only a witness in a suit against another doctor. However, Dr. Hackethal said nothing was discussed about coverage for hearings before administrative agencies with the power to discipline physicians.

### *Purchasing the Policy.*

Dr. Hackethal read the information in the brochure, filled out the application portion of the brochure, and gave the application and a $30 check to the agent. Sometime thereafter, Dr. Hackethal received the policy in the mail along with a transmittal letter stating he would be covered if he were a *defendant* in a case. Dr. Hackethal read the transmittal letter and the policy. He specifically noticed the policy referred to spending time in "court" or in the "trial court."

The policy noted thereon the policy period and stated that period could be extended for terms of 12 months, provided the required renewal premium therefor was paid to, and accepted by, the company. For each of the nine years thereafter, the company accepted Dr. Hackethal's premium without making any change in the terms of the policy. No claim was made by Dr. Hackethal until the 1976/1977 policy term.

### *The Relevant Policy Terms.*

Under the caption "INDEMNITY AGREEMENTS," the short *two-page* policy provides:

"1. COVERAGES:

"*Coverage A: Malpractice Defendants Indemnity*

"To pay to the insured, as reimbursement for expense and loss of earned income, the daily indemnity stated in the declarations, . . . for each day the insured is required to attend *the trial of a civil suit for damages against the insured* alleged to have been caused by malpractice in the practice of the profession of the insured . . . ."

"*Coverage B: Automobile Accident Defendants Indemnity*

"To pay to the insured, as reimbursement for expense and loss of earned income, the daily indemnity stated in the declarations, . . . for each day the

insured is required to attend *the trial of a civil suit for damages against the insured* alleged to have been caused by an automobile accident." (Italics added.)

In the declarations, on page one of the policy, the "Daily Indemnity" for both "Coverage A—Malpractice Defendants Indemnity" and "Coverage B —Automobile Accident Defendants Indemnity" is shown as $200 "Per Day"[4] and $5,000 "Per Trial."

*The Claim.*

In 1976, the Attorney General of the State of California, on behalf of the Board of Medical Quality Assurance of the State of California (BMQA), filed an accusation against Dr. Hackethal, charging him with gross negligence and incompetence in the practice of medicine and with acts of moral turpitude, dishonesty and corruption, in that he falsified Medicare statements and falsified hospital charts and records. The Attorney General prayed that BMQA issue a decision revoking Dr. Hackethal's license to practice medicine in this state. No damages or other form of compensation were requested in the accusation. The matter was referred to an administrative law judge who conducted administrative hearings on the accusation on 39 different days.

On November 16, 1977, Dr. Hackethal submitted a claim to Nettleship for the time he spent away from the office during those administrative hearings. Despite 18 years of claims experience with this insurance policy form, National had never received such a claim before. The claim was denied on December 19, 1977, by letter stating that administrative proceedings such as the BMQA hearings were not covered by the policy. Following that initial denial, Dr. Hackethal and National exchanged many communications in regard to the claim, but National never changed its original position that the claim was not covered.

DISCUSSION

*No Coverage.*

██ National and Hall correctly contend the trial court erred in denying National's motion for a directed verdict on the question of coverage.

██ It is well settled that when, as in the present case, the interpretation of a written instrument is a question of law (i.e., it is not dependent on a

---

[4]An endorsement which accompanied the policy changed the daily indemnity from $100 to $200 per day.

resolution of conflicts in extrinsic evidence), the appellate court must make its own independent determination of the meaning of the contract. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Stewart v. Estate of Bohnert* (1980) 101 Cal.App.3d 978, 985 [162 Cal.Rptr. 126]; *Pepper Industries, Inc. v. Home Ins. Co.* (1977) 67 Cal.App.3d 1012, 1018 [134 Cal.Rptr. 904]; *Gulf Ins. Co. v. Edgerly* (1973) 31 Cal.App.3d 334, 338 [107 Cal.Rptr. 246].)

■ Despite the strong authority mandating construction of ambiguous language in an insurance contract in favor of the insured (see *Stewart v. Estate of Bohnert, supra,* 101 Cal.App.3d at p. 985; *Pepper Industries, Inc. v. Home Ins. Co., supra,* 67 Cal.App.3d at p. 1018), it is clear that "[s]ome actual or apparent ambiguity must be present before the rule comes into play" (*Wetzler v. State Farm Mut. Auto. Ins. Co.* (1966) 246 Cal.App.2d 472, 476 [54 Cal.Rptr. 756]; see *Stewart v. Estate of Bohnert, supra,* 101 Cal.App.3d at p. 986; *Jarrett v. Allstate Ins. Co.* (1962) 209 Cal.App.2d 804, 810 [26 Cal.Rptr. 231]).

■ "It is, of course, well established that an insurer has a right to limit the policy coverage in plain and understandable language, and is at liberty to limit the character and extent of the risk it undertakes to assume [citations]." (*VTN Consolidated, Inc. v. Northbrook Ins. Co.* (1979) 92 Cal.App.3d 888, 892 [155 Cal.Rptr. 172]; *Aas v. Avemco Ins. Co.* (1976) 55 Cal.App.3d 312, 317 [127 Cal.Rptr. 192].) ■ It is likewise axiomatic that an insurance policy is but a contract and that like all other contracts, it must be construed from the language used; where, as here, its terms are plain and unambiguous, the courts have a duty to enforce the contract as agreed upon by the parties. (*VTN Consolidated, Inc. v. Northbrook Ins. Co., supra,* 92 Cal.App.3d at p. 892; *State Farm Mut. Auto. Ins. Co. v. Herron* (1977) 71 Cal.App.3d 673, 677 [139 Cal.Rptr. 575].)

Thus, courts may not rewrite the insurance contract or force a conclusion to exact liability where none was contemplated. (*Aas v. Avemco Ins. Co., supra,* 55 Cal.App.3d at p. 320; *State Farm Mut. Auto. Ins. Co. v. Flynt* (1971) 17 Cal.App.3d 538, 547 [95 Cal.Rptr. 296].)

■ The foregoing principles apply here and preclude coverage.

The description of the occurrence which triggers coverage appears in the indemnity agreement paragraphs denominated "Coverage A" (Malpractice Defendants Indemnity) and "Coverage B" (Automobile Accident Defendants Indemnity). Under both Coverage A and Coverage B, the triggering event occurs "each day the insured is required to attend *the trial of a civil suit for damages against the insured* alleged to have been caused" either "by

malpractice in the practice of the profession of the insured" (Coverage A) or "by an automobile accident" (Coverage B). (Italics added.) This policy language is clear and unambiguous with respect to its noninclusion of coverage for administrative hearings like those before BMQA.[5]

Dr. Hackethal's required attendance at a hearing before BMQA on charges that he had evinced great negligence and incompetence in his practice of medicine and had committed acts involving moral turpitude, dishonesty and corruption, is not the type of event for which National assumed the risk under either Coverage A or Coverage B of its policy. That is so because such a hearing is not a "trial of a civil suit for damages against the insured," the only type of proceeding for which coverage is provided according to the plain language of the policy.

Dr. Hackethal urges, however, that he should be afforded coverage because he was "damaged" by the BMQA hearing, in that his license was suspended and he was placed on probation. While that may be true, the policy requires that the relevant trial be one which is brought to assess "damages against the insured" alleged to have been caused by the insured's professional malpractice or by an automobile accident. The BMQA hearing simply did not result in "damages" being assessed against Dr. Hackethal. (Cf. *Jaffe* v. *Cranford Ins. Co.* (1985) 168 Cal.App.3d 930, 934 [214 Cal.Rptr. 567].) " 'Damages' describes a *payment* made [by the insured] to compensate a party for injuries suffered." (*Id.*, at p. 935, italics added.)[6]

Because the BMQA hearing was not the type of proceeding for which Dr. Hackethal was indemnified under the National policy, we hold the trial court erred in denying National's motion for directed verdict on the question of coverage.

*No Fraud.*

 National's and Hull's contention that the trial court erred in denying their motion for directed verdicts on the fraud cause of action is equally meritorious.

---

[5]Dr. Hackethal contacted the California Department of Insurance (the Department) in regard to his unpaid claim against National under the policy. The Department determined the policy language was ambiguous and urged National to reassess its decision to deny Dr. Hackethal's claim. In response, National sent the Department a copy of an opinion letter of its own counsel which stated Dr. Hackethal was not entitled to indemnity under the terms of the policy; National advised the Department it believed its original position was correct. It again denied Dr. Hackethal's claim. National did not hear further from the Department.

[6]National has acknowledged in internal memos that the policy can reasonably be interpreted to cover an insured's required attendance at proceedings associated with "a trial of a civil suit for damages against the insured," i.e., depositions, pretrial conferences, etc.

(7) "The elements of fraud, which give rise to the tort action for deceit, are (1) misrepresentation (false representation, concealment or non-disclosure); (2) knowledge of falsity (or 'scienter'); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 446, p. 2711.)

Dr. Hackethal relies upon alleged written misrepresentations in the National policy, alleged written misrepresentations in the Nettleship brochure, and alleged verbal misrepresentations made by the Nettleship agent, in asserting National and Hall are liable for fraud.

■ Inasmuch as we have determined, *ante,* that, according to the plain language of the contract, the National policy did not provide coverage for Dr. Hackethal's required attendance at the BMQA hearing, we need only address the questions whether National and/or Hall may be held liable for fraud as a result of alleged misrepresentations made in the Nettleship brochure and/or by the Nettleship agent.

Our perusal of the Nettleship brochure reveals no misrepresentations. Although the representations in the Nettleship brochure were succinct, they were not in conflict with, nor misleading with regard to, the actual terms of the National policy.

Now, with regard to the brochure, significantly, the Nettleship agent handed it to Dr. Hackethal at the time the agent is alleged to have made the misrepresentations regarding coverage. The boldly printed material in the brochure contradicted the misrepresentations allegedly made by the Nettleship agent to the effect that the National policy would cover Dr. Hackethal even if he were merely a *witness* in a suit against another doctor. In at least four places on the brochure the policy is described as the "DEFENDANTS REIMBURSEMENT POLICY," and on the cover of the brochure in large letters appears the question, "IF *YOU* WERE SUED WHAT WOULD YOU LOSE?" (Italics added.) Dr. Hackethal testified that he read the brochure before he tore off the attached application form and gave it and his check to the agent.

Further, Dr. Hackethal admitted the Nettleship agent never told him the policy provided coverage for administrative hearings like that before which he was required to appear by BMQA. Given the particular circumstances of this case, when Dr. Hackethal renewed the National policy for the 1976/1977 term, we cannot see how anything the agent said nine years earlier would have caused him to reasonably believe that his contract covered hearings like those before BMQA. If he did rely on the statements of the Nettleship agent in forming such belief, and for that reason renewed the policy, his reliance was *unjustifiable* as a matter of law.

The brochure, which Dr. Hackethal carefully preserved with the original policy for nine years, put him on notice that the terms of the policy controlled the extent of his coverage. The brochure clearly states: "This brochure briefly outlines the insurance plan. Complete details and provisions of the insurance are contained *in the policy*." (Italics added.) Moreover, the policy itself proclaims in bold letters: "PLEASE READ YOUR POLICY." Dr. Hackethal testified that he did in fact read his policy when he received it, but stated that he "didn't analyze it . . . ." He should have done so.

■ " 'It is a general rule that the receipt of a policy and its acceptance by the insured without an objection binds the insured as well as the insurer and *he cannot thereafter complain that he did not read it or know its terms. It is a duty of the insured to read his policy.*' " (*Aetna Casualty & Surety Co. v. Richmond* (1977) 76 Cal.App.3d 645, 652 [143 Cal.Rptr. 75], italics added; *Taff* v. *Atlas Assur. Co.* (1943) 58 Cal.App.2d 696, 703 [137 P.2d 483]; *Kahn* v. *Royal Indemnity Co.* (1918) 39 Cal.App. 180, 183-184 [178 P. 331].)

■ In light of the foregoing discussion, we hold the trial court erred in denying National's and Hull's motion for directed verdicts on the cause of action for fraud.

Our analysis makes it unnecessary to reach the other contentions raised by National and Hall on their cross-appeal and by Dr. Hackethal on his appeal.

### DISPOSITION

The judgment on the verdicts against defendants, respondents and cross-appellants National and Hall is reversed. The appeal of plaintiff, appellant and cross-respondent Dr. Hackethal from the judgment notwithstanding the verdict on the emotional distress issue and from the new trial order on the other issues is dismissed as moot. Dr. Hackethal is to bear the costs on appeal of National and Hall.

Klein, P. J., and Danielson, J., concurred.

A petition for a rehearing was denied March 25, 1987, and the petition of plaintiff and appellant for review by the Supreme Court was denied May 20, 1987.