[No. A041180. First Dist., Div. One. Oct. 19, 1990.]

MASONITE CORPORATION et al., Plaintiffs and Appellants, v. GREAT AMERICAN SURPLUS LINES INSURANCE COMPANY et al., Defendants and Appellants.

COUNSEL

Rawles, Hinkle, Carter, Behnke & Oglesby, Jared G. Carter and Cindee F. Mayfield for Plaintiffs and Appellants.

Hancock, Rothert & Bunshoft, Ray L. Wong, Patricia Shuler Schimbor, Ernest J. Beffel, Jr., and Paul J. Killion for Defendants and Appellants.

Michael J. Breining, William J. Berry, Jr., Brobeck, Phleger & Harrison, Thomas M. Peterson, Carol B. Sharp, Lasky, Haas, Cohler & Munter, Moses Lasky, John E. Munter and Scott P. DeVries as Amici Curiae on behalf of Defendants and Appellants.

OPINION

STEIN, J.—

## INTRODUCTION

Great American Surplus Lines Insurance Company (GASLIC) issued an environmental impairment liability insurance policy to Masonite Corporation (Masonite).[1] The California Regional Water Quality Control Board (RWQCB) subsequently discovered that there was soil and water contamination at the site of one of Masonite's operations and issued a cleanup and abatement order. GASLIC denied coverage and Masonite brought an action against GASLIC, and others. The complaint, among other things, sought a declaration that the GASLIC policy covered Masonite's claim. This portion of the complaint was severed from the remainder of the action. The matter was submitted to a jury, which found no coverage.

Masonite contends on appeal that the jury was misled to Masonite's detriment by certain jury instructions and by a verdict form. There is no argument that the evidence does not support the verdict; rather, the argument is that the jury probably would have reached a different verdict had it been instructed properly. Accordingly, it is irrelevant that there was substantial evidence supporting the jury's verdict on the instructions actually given. " ' "[I]n determining whether a verdict is supported by the evidence,

[1] GASLIC also issued a policy to Timber Realization Company, which had purchased various properties, including that at issue here, from Masonite, and which essentially is a holding company for Masonite. We, as do the parties, treat Masonite and Timber Realization Company as if they were the same entity.

we must assume that the jury accepted the view most favorable to the respondent. However, in determining whether or not the instructions given are correct, we must assume that the jury might have believed the evidence upon which the [cause of action or defense of] the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party." ' " (*Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 643-644 [220 P.2d 897].) Therefore, the question is whether the instructions, if improper, led to a miscarriage of justice. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 770 [206 Cal.Rptr. 354, 686 P.2d 1158].)

FACTS

In 1970 Masonite purchased a wood preserving plant, established in 1960, from Pacific Wood Preserving. The operations of both Pacific Wood Preserving and Masonite included the discharge of chemical wastes into the ground at or around the site. The RWQCB, which had inspected the site throughout its operation, in 1975 demanded that Masonite take corrective action to "eliminate and abate the discharge in compliance with the waste water discharge requirements." In response, Masonite took some corrective measures but soon closed the plant. The RWQCB required Masonite to monitor the waters in the vicinity of the plant for presence of chemicals and for fish survival. The RWQCB was at that time satisfied with Masonite's actions and, in 1981, lifted the monitoring requirements, apparently finding that because the monitoring had disclosed acceptable limits of contamination and because no additional discharges of chemicals had occurred at that site, there was no further need to continue the monitoring.

In 1982, Masonite purchased the policy of environmental impairment liability insurance here at issue. In 1983 the RWQCB, which had become aware that wood treatment plants and other sources of chemical discharges created more serious problems than were originally understood (i.e., that waters could be affected not just by surface run-off but by chemicals present in the underlying soils), drilled several test wells at the Cloverdale site. The wells disclosed that the ground water and soils were contaminated; the RWQCB issued a cleanup and abatement order.

Masonite called upon GASLIC to pay for the cleanup and abatement; GASLIC refused on the grounds that its policy did not cover the claim, and the present litigation followed.

## DISCUSSION

### I.

*The Instructions Properly Informed the Jury That Coverage Existed Only if the Act, Rather Than the Damage, Was Gradual and Fortuitous and Neither Expected Nor Intended*

Although Masonite's contentions relate to jury instructions and a special verdict form, the underlying question is one of interpretation of the insurance policy.[2] ■ The interpretation of an insurance policy, like that of any contract, is primarily a judicial function; and where there is no conflict in the extrinsic evidence, a reviewing court makes its own independent determination of the contract's meaning. (*Hackenthal* v. *National Casualty Co.* (1987) 189 Cal.App.3d 1102, 1108-1109 [234 Cal.Rptr. 853]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839].) In the present case, the trial court did not expressly interpret the policy's provision; however, the instructions and verdict form necessarily reflect an interpretation of the policy. Masonite contends that interpretation is incorrect and, further, that it improperly left issues of interpretation to the jury.

An environmental impairment liability insurance policy, such as that at issue here, is fairly uncommon and rarely discussed in case law. Prior to the availability of environmental impairment insurance, companies such as Masonite sought to protect themselves by purchasing comprehensive general liability insurance. These policies usually specifically excluded damage caused by pollution by providing: "This policy does not apply . . . to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." (See, e.g., *Jackson TP., etc.* v. *Hartford Acc. & Indem.* (1982) 186 N.J.Super. 156 [451 A.2d 990, 991-992]; *Molton, Allen & Williams, Inc.* v. *St. Paul F. & M. Ins.* (Ala. 1977) 347 So.2d 95.) The evident purpose of this exclusion was to protect the insurer against claims

---

[2] The issues raised in this appeal relate to the very specific, and unusual, wording of the coverage provision of an environmental impairment liability insurance policy. Two amici curiae briefs have been filed and a number of appellate issues are framed as if the policy at issue contained the same language as is contained in standard comprehensive general liability insurance policies. It does not; and we only interpret the language in the policy at issue.

arising from pollution resulting from a gradual and/or continuous exposure to contaminants.

A number of courts ultimately found the usual ambiguities in the phrase "sudden and accidental," holding that the exclusion applied only where the damage which occurred was in fact intended, whether or not the act causing the damage was itself intended and whether or not the act causing the damage was gradual. (*Jackson TP., etc.* v. *Hartford Acc. & Indem., supra*, 451 A.2d at p. 994, and see cases discussed there.) In the meantime, however, there was the potential of a gap in insurance; a company such as Masonite might not be protected from liability for damage caused by gradual pollution. GASLIC apparently determined to step into this gap and created its environmental impairment liability policy.[3]

GASLIC's policy contains an exclusion that "This insurance does not apply to LOSS: A. arising from ENVIRONMENTAL IMPAIRMENT which is sudden and accidental"—loss which traditionally was excepted from the pollution exclusion to a comprehensive general liability insurance policy.

Further, rather than repeat the language used in the standard comprehensive general liability insurance policies providing coverage for occurrences, i.e., "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured," GASLIC's environmental impairment liability insurance policy provided coverage for "environmental impairment," defined as "damage to the environment caused by:

"1. the emission, discharge, disposal, dispersal, release, seepage, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants, into or upon land, the atmosphere or any watercourse or body of water, or

"2. the generation of odor, noises, vibrations, light, electricity, radiation, changes in temperature, or any other sensory phenomena arising out of or in the course of the INSURED'S operations provided (1) and (2) are gradual and fortuitous and neither expected nor intended by the INSURED."

---

[3]The record indicates that as of the end of 1980, GASLIC viewed environmental impairment insurance as a new and potentially lucrative market, which market it entered as of February 1981.

The jury was instructed[4] that they could find coverage only if the "emission, discharge, disposal, dispersal, release, seepage, or escape" of the pollutants was "gradual and fortuitous and neither expected nor intended." The verdict form required the jury to answer "yes" or "no" to a like-phrased question. Masonite contends that the instruction is improper as it precludes a finding of coverage if the insured intended the act causing the harm but not the harm itself. If the policy at issue contained a coverage clause similar to that set forth in standard comprehensive general liability insurance policies, this contention might have merit. As discussed, *post*, those policies either specify that coverage is provided for unintended damage, or that coverage is provided for "accidents," a word which has been construed judicially to mean unintended damage. (See, e.g., *Meyer* v. *Pacific Employers Ins. Co.* (1965) 233 Cal.App.2d 321 [43 Cal.Rptr. 542] [policy provided coverage for sums insured legally obligated to pay as damages unless caused by accident]; *Clemco Industries* v. *Commercial Union Ins. Co.* (N.D.Cal. 1987) 665 F.Supp. 816 [comprehensive general liability policy providing coverage for "occurrence"].)

The coverage clause in the instant policy, however, is different. Unlike the standard comprehensive general liability policy, the policy at issue here does not provide coverage for an accident or for an occurrence defined as an accident. It provides coverage for "environmental liability." Those cases which define accident as including an intentional act causing unintended damage are therefore inapposite. Further, unlike the "occurrence" comprehensive general liability policies where the phrase "neither expected nor intended" modifies "bodily injury or property damage" (i.e., coverage is provided for an occurrence defined as an accident causing damage which is neither expected nor intended), the relevant phrase in the instant policy

---

[4] The instruction defined "environmental impairment" in the same manner as defined in the insurance policy: "The insurance policy defines 'environmental impairment' as follows:

" ' . . . damage to the environment caused by (1) the emission, discharge, disposal, dispersal, release, seepage, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants, contaminants or pollutants, into or upon land, the atmosphere or any watercourse or body of water, or (2) the generation of odor, noises, vibrations, light, electricity, radiation, changes in temperature, or any other sensory phenomena, arising out of or in the course of the insured's operations provided (1) and (2) are gradual and fortuitous and neither expected nor intended by the insured.' " And it further instructed:

"What must be 'gradual and fortuitous and neither expected nor intended' is not merely the 'emission, discharge, disposal, dispersal, release, seepage or escape' of some substance.

"What must be 'gradual and fortuitous and neither expected nor intended' are all of the following:

"First: an emission, discharge, disposal, dispersal, release, seepage, or escape;

"Second: of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants;

"Third: into or upon land, the atmosphere, or any watercourse or body of water."

modifies the *cause of the damages* rather than the damage itself. Thus, by a straightforward reading of the policy language the phrase "gradual and fortuitous and neither expected nor intended" modifies those terms set forth in (1) and (2); i.e., the acts producing the damage. Substituting the specific facts of this case for the more general contract terms, the policy would read: "ENVIRONMENTAL IMPAIRMENT means damage to the environment caused by (1) the discharge of pollutants upon land arising out of or in the course of Masonite's operations provided (1)—the discharge—is gradual and fortuitous and neither expected nor intended by Masonite."

We recognize that such a reading severely limits the coverage provided by the policy, and that it limits it far beyond the limitations set forth in a standard comprehensive general liability insurance policy. █ It is, however, "'well established that an insurer has a right to limit the policy coverage in plain and understandable language, and is at liberty to limit the character and extent of the risk it undertakes to assume [citations].' [Citations.] █ It is likewise axiomatic that an insurance policy is but a contract and that like all other contracts, it must be construed from the language used; where, as here, its terms are plain and unambiguous, the courts have a duty to enforce the contract as agreed upon by the parties. [Citations.]" (*Hackenthal v. National Casualty Co., supra,* 189 Cal.App.3d at p. 1109.)

██ We also recognize that it is generally held that an ambiguity in an insurance policy must be construed against the insurer (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764]) and that "'Contracts of insurance should be viewed in the light of their general objects and purposes, including the legitimate conditions prescribed by the insurer . . . . In general, the object and purpose of insurance is to indemnify the insured in case of loss, and ordinarily such indemnity should be effectuated rather than defeated . . . . An insured is entitled to the protection which he buys and for which he pays substantial premiums.' [Citations.]" (*Insurance Co. of North America v. Electronic Purification Co.* (1967) 67 Cal.2d 679, 689 [63 Cal.Rptr. 382, 433 P.2d 174].) █ However, it is equally true that "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co. v. Pisciotta, supra,* 30 Cal.3d at p. 807.)

█ We see no ambiguity here. Only a strained reading of the language conferring coverage when "(1) and (2) are gradual and fortuitous and neither expected nor intended" would permit a finding of coverage when (1) and (2) are not gradual and fortuitous and are either expected or intended. Nor are we persuaded of the existence of an ambiguity by a memorandum

or letter from GASLIC's claims manager wherein he noted, "I think we need to discuss the use of the word fortuitous and reach some agreement as to how it applies to environmental impairment liability insurance coverage. Our form seems to say that only the fortuitous emission, discharge, etc. of wastes that results in an environmental impairment is covered. Or, do we mean that only the fortuitous damage to the environment as a result of emissions or discharges is covered? This may seem like a sophist argument but the question has been raised and it needs clarification." Even were we to take the opinion of the claims manager as dispositive on the issue of ambiguity, the claims manager's memorandum indicates only that he reads the coverage provision as do we, but wonders if that is the type of coverage the company wishes to provide.

We therefore conclude that under the unusual, if not unique, wording of the GASLIC policy, coverage is provided only if the act causing damage was gradual and fortuitous and neither expected nor intended. Thus, for example, coverage might be had for damage caused by a leak in a storage or holding tank where that leak was gradual and fortuitous and neither expected nor intended, but damage caused by the intentional discharge of pollutants is not covered.

## II.

### *The Act Causing the Damage Was Not Fortuitous, and Was Expected and Intended*

Masonite strenuously argues that the terms "fortuitous" and "neither expected nor intended" may not be read to preclude coverage for unintended results of intended acts. This argument, while again one often accepted where the policies at issue are comprehensive general liability policies providing coverage for "accidents" or "occurrences," is not relevant here where coverage extended only to defined causal acts. Masonite does not claim otherwise but that it intended the casual acts of discharging chemicals into the ground and holding tank. Accordingly, there was no coverage under the plain meaning of the GASLIC policy.

A related argument is that the terms "fortuitous" and "neither expected nor intended" require the use of a subjective rather than an objective standard. It is argued that instruction 17 and the verdict form were improper in that they called upon the jury to apply an objective standard of "substantial

probability" in determining if the discharge, etc., was "expected and intended."[5]

We decline to take any position on this argument, finding it unnecessary where it is undisputed that Masonite subjectively intended to discharge the pollutants onto the land. Accordingly, we need not and do not determine whether the correct standard was that enunciated by the court in *City of Carter Lake* v. *Aetna Cas. and Sur.* (8th Cir. 1979) 604 F.2d 1052,[6] or by any other authority. Nor need we determine if Masonite somehow invited any error caused by the instruction.

Another contention raised is that the instructions and verdict form improperly forced the jury to interpret the contract and failed to instruct them on the rules of interpretation of contracts. The instructions, however, incorporated the trial court's construction of the contract; the jury was not required to interpret the policy language. In all events where, as here, it is undisputed that the causal acts were intended, Masonite could not have been prejudiced by any instructional error in this regard.

## III.

*While an Instruction Improperly Shifted the Burden of Proof, the Error Was Harmless*

As relevant, the jury was instructed: "The plaintiffs have the burden of proving by a preponderance of the evidence all of the facts necessary to establish:

---

[5] This instruction informed the jury: "You are to use the following definition of 'expected or intended': an emission, discharge, disposal, dispersal, release, seepage, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemical, liquids, or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water is considered expected or intended by Masonite . . . if they knew or should have known that there was substantial probability that the operations at the former wood treating site would result or had resulted in the emission, discharge, disposal, dispersal, release, seepage, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemical, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water.

" 'Substantial probability' means indications strong enough to alert a reasonably prudent man that emissions, discharges, etc., referred to above were highly likely to occur."

[6] "[F]or the purposes of an exclusionary clause in an insurance policy the word 'expected' denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions. If the insured knew or should have known that there was a *substantial probability* that certain results would follow his acts or omissions then there has not been an *occurrence or accident as defined in this type of policy* when such results actually come to pass." (*Id.* at pp. 1058-1059, our italics.)

"1.   That damage to the environment at the former wood treating plant arose out of or in the course of operations of MASONITE, or could arise out of or in the course of operations of MASONITE.

"2.   That the emission, discharge, [etc., of] . . . pollutants, into or upon land, the atmosphere or any watercourse or body of water at the former wood treating plant was fortuitous, (i.e., by chance or accident).

"3.   That the emission, discharge, [etc., of] . . . pollutants, into or upon land, the atmosphere or any watercourse or body of water at the former wood treating plant was neither expected nor intended by MASONITE."

These instructions placed the burden on Masonite, the insured, to prove that the conditions for coverage existed.[7] Masonite argues that it did not have to prove that conditions for coverage existed; rather, GASLIC had to prove that the circumstances of the present case fell within an exclusion to coverage. GASLIC counters that the law requires only that the insurer prove that the situation falls within any relevant exculpatory clause, and that there is no relevant exculpatory clause here because the phrase "gradual and fortuitous and neither expected nor intended" is set forth in the basic coverage provision.

We need not and do not decide the point. Masonite has never contended but that it acted intentionally in discharging chemicals onto the ground or into the holding tank. It follows that an improper allocation of the burden of proof could not have had any effect on the jury's verdict. The error, if any, was harmless.

Finding no error requiring reversal, the judgment is affirmed. All parties are to bear their own costs on appeal.

Racanelli, P. J., and Newsom, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied January 4, 1991. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

[7] The insured has the burden of proving the contract of insurance and its terms, but the insurer bears the burden of bringing itself within an exculpatory clause contained in an insurance policy. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Executive Aviation, Inc.* v. *National Ins. Underwriters* (1971) 16 Cal.App.3d 799, 806 [94 Cal.Rptr. 347].)