BANK OF THE WEST, a California Banking Corporation, Plaintiff–Appellee–Cross–Appellant,

v.

The VALLEY NATIONAL BANK OF ARIZONA, an Arizona Banking Corporation, Defendant–Appellant–Cross–Appellee.

Nos. 92–16278, 92–16382.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 13, 1993.

Decided Nov. 23, 1994.

See also 132 F.R.D. 250.

Before: POOLE, BEEZER and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

Two banks loaned $11 million dollars pursuant to a loan participation agreement between them. The participating bank relied more heavily on the lead bank than the participation agreement allowed. After the debtor failed, a flood of lawsuits cost the lead bank millions of dollars. The lead bank sued the participating bank to recover one-half the litigation expenses. The participating bank counterclaimed, alleging that the lead bank fraudulently induced it to advance money by failing to share important information. The lead bank won below. We affirm, except for a collateral source rule issue regarding the lead bank's insurance.

## I. FACTS

Bank of the West loaned money to Technical Equities Corporation. As the line of credit grew, Bank of the West needed another bank to participate in order to avoid violating its lending limits. (Ex 279). In a series of loan participation agreements, Valley National Bank committed itself to 50% of the loan and 50% of any extraordinary expenses. (Ex 410, 427, 483). "A [loan] participation, as distinguished from a multi-bank loan transaction (syndicated loan), is an arrangement in which a bank makes a loan to a borrower and then sells all or a portion of the loan to a purchasing Bank. All documentation of the loan is drafted in the name of the selling bank." August 2, 1984 circular from the Comptroller of the Currency, Administrator of National Banks (Supp. Ex 401).

Valley National had previously agreed to carry 46.3% of what was in January 1984 a $5.4 million loan. (Ex 410). In December, the banks raised the line of credit maximum to $12 million, and Valley National's participation to 50%. (Ex 180 ¶ 12,427) Bank of the West was to manage the loan and deal with Technical Equities.

Michael D. Torpey, Orrick, Herrington & Sutcliffe, San Francisco, CA, for defendant-appellant-cross-appellee.

Kenneth K. Kennedy, Kennedy & Schisler, San Jose, CA, for plaintiff-appellee-cross-appellant.

Two paragraphs of the loan participation agreement are especially important to this decision. Under paragraph 5 [1], the parties agreed that Valley National made its own decision on Technical Equities' creditworthiness, without relying on Bank of the West, and would continue to do so. (Ex 428 ¶ 5). Bank of the West was not to be responsible for errors or omissions regarding Technical Equities' creditworthiness "except for [its] own gross negligence, bad faith, or willful misconduct." *Id.*

Under paragraph 6 [2], Bank of the West, as lead bank, was to bear the ordinary expenses of managing the line of credit. (Ex 429 ¶ 6). "Extraordinary expenses" were to be split "proportionately." *Id.* The "extraordinary expenses" were defined as "reasonable expenses" in connection with enforcing the bank's creditors' rights, and also amounts paid to others for liabilities arising out of claims relating to the loan. Valley National retained the right to terminate its obligation to make future advances on 30 days notice.

At the end of 1984, even though the parties agreed to split the line of credit evenly, Valley National had only loaned $2.5 million of the outstanding $8.1 million loan balance. (Ex 180 ¶ 10, Ex 425). The banks agreed that Bank of the West would be "first in, last out." (Ex 426). That meant Bank of the West would be the first to advance funds up to its lending limit of $6 million, and any

1. Paragraph 5 of the participation agreement states in full:

Lender shall apply its customary and usual business procedures with respect to handling the Loan, including making such examinations as Lender deems necessary. Lender shall not be liable to Participant for any action taken or omitted or for any mistake, omission or error, except for Lender's own gross negligence, bad faith or willful misconduct. Lender does not assume and shall have no responsibility or liability, express or implied, for the collectibility, enforceability, genuineness or validity of any instruments, agreements, the Loan Documentation, or the Collateral or the financial condition of the Borrower, or any obligor or guarantor, or any credit or other information furnished by Lender to Participant. Lender has made its files relating to the Loan available for review to Participant and has provided Participant with copies of the Loan Documentation. Both Lender and Borrower have provided Participant with or granted Participant access to all of the financial and other information that Participant has requested or believes to be necessary to enable Participant to make an independent, informed judgment with respect to the credit worthiness of the Borrower, the value and extent of the Collateral, and the desirability of purchasing the Participation Share. Participant has independently, and without reliance upon any representations of Lender, and based on (i) the financial information referred to or set forth in the Loan documentation; (ii) various information provided to Participant by the Borrower; and (iii) such other financial statements, documents and information as Participant has deemed appropriate, made and relied upon Participant's own credit analysis and judgment to execute this Participation Agreement and to purchase the Participation Share. Independently and without reliance upon Lender, and based on such financial statements, documents and information as Participant deems appropriate at the time, Participant shall continue to make and rely upon Participant's own credit

decisions in taking or not taking action under this Participation Agreement.

2. Paragraph 6 provides:

Lender [Bank of the West] shall bear the cost of servicing the loan, but not including Extraordinary Expenses. The term "Extraordinary Expenses" shall include all reasonable expenses incurred or sustained by Lender in connection with the enforcement of Lender's rights and remedies against the Borrower or with regard to the Collateral, or for the protection of the Collateral pursuant to the Loan, including, without limitation, all court costs, collection charges, attorneys' and accountants' fees, investigation and appraisal fees, insurance charges, expenses of special examinations and audits, and other out-of-pocket expenses. Extraordinary Expenses shall also include any amount paid or required to be paid by Lender in connection with any liability or expense arising out of any claim of excessive interest, invalid transactions, preferential or fraudulent transfers or other claim relating to the Loan or the Collateral, and whether by compromise, judgment or otherwise. Lender may pay or advance all Extraordinary Expenses, and all such Extraordinary Expenses shall be added to the Loan when so paid or advanced, and Lender may adjust the Participation Share accordingly. Participant shall promptly reimburse Lender for Participant's proportionate share of Extraordinary Expenses, to the extent such Extraordinary Expenses are not collected from the Borrower. All Extraordinary Expenses and all recoveries thereof from the Borrower shall be shared by Participant in accordance with Participant's respective Participation Percentage. Whenever practicable, Lender shall advise Participant of all anticipated Extraordinary Expenses prior to incurring the same. Lender may, in its discretion, reserve such portion of collections as may be necessary to cover Extraordinary Expenses which have accrued, been paid, or are foreseeable.

payments reducing the balance would be treated as credits against Valley National's share, so long as it did not fall below $2,500,-000. At the time, when Technical Equities appeared to be thriving, both banks apparently were focused on the benefits of receiving interest rather than the risk of nonpayment. They anticipated that eventually the line of credit would reach the $12 million limit.

Technical Equities turned out to be much less creditworthy than its growth suggested. Much of its business was purchase and sale of real estate, and much of the banks' collateral consisted of promissory notes secured by deeds of trust from the buyers to Technical Equities. In January of 1985, Bank of the West discovered that Technical Equities had, on some properties, bought property, immediately resold it with 100% financing, and carried the value on its books at the higher resale price. (Ex 318a). These back to back leveraged transactions had the practical effect of diluting the banks' collateral.

The person at Bank of the West who discovered the back-to-back escrows immediately telephoned the Valley National officer handling the line of credit and told him about them. *Id.* Valley National froze its line of credit after receiving this information. (Ex 474). The banks did not loan any more money to Technical Equities after February 1, 1985. (Ex 185 ¶ 25).

In March and April, Bank of the West intensively studied the Technical Equities line of credit. Two people, Jacques Robbins, an officer of Banque Nationale de Paris, Bank of the West's parent company, and Michael Anderson, a Bank of the West employee, wrote devastating reports about Technical Equities, in March and April. (Ex 446, 472). The two page Anderson memorandum said that the balance sheet was inflated and the quality of earnings uncertain. (Ex 473). The much more extensive independent report from Mr. Robbins confirmed Mr. Anderson's misgivings. In 22 pages of analysis and tables, the Robbins report demonstrated that, with respect to Technical Equities reports and valuations, "little is as it seems." (Ex 449). Mr. Robbins concluded that Technical Equities "represents a very

high risk to a lender and [he] would recommend avoiding the company." (Ex 470).

This time, Bank of the West did not immediately pass on the bad news to Valley National. Bank of the West's loan officer was told in May 1985 that Technical Equities was a "house of cards," but understood he should not tell anyone about its condition. (Ex 321-22). Not until September did Bank of the West tell Valley National Bank the seriousness of the problems.

In September, Bank of the West sent Technical Equities a letter freezing its line of credit. The letter gave several reasons, including missing documentation on specific properties, "obvious misunderstanding" regarding valuation of collateral, and "uncertain quality of overall earnings as reported." The letter said that after bringing the liens up to 80% of its own independent appraisals, Bank of the West planned "an orderly liquidation of the line" of credit. "The Bank's objective is to bring our relationship back in line with something approximating conventional commercial bank real estate lending."

Bank of the West sent a copy of this letter to Valley National. Once it received this letter, in early September, Valley National knew that Bank of the West regarded the Technical Equities line of credit as unsatisfactory.

The time period when Bank of the West knew something bad about Technical Equities' credit, and had not told Valley National, was roughly the period from March to September of 1985. At the beginning of this period, Technical Equities owed principal of about $10.3 million. (Ex 185 ¶¶ 24-25). Of the $10.3 million, Bank of the West carried about $6.3, Valley National approximately $4 million. (Ex 476).

After February, neither bank loaned any more money to Technical Equities. During the spring and summer, when Bank of the West knew more than Valley National about how bad the Technical Equities credit risk was, Valley National did not advance any more money to Bank of the West. Even though Bank of the West did not disclose the Anderson and Robbins reports to Valley National, and arguably should have, no money

changed hands because of the nondisclosure. Valley National had some notice of Technical Equities' condition in February, and froze its line of credit in April, even though it was not then told of the reports Bank of the West obtained from its own people in March and April. (Ex 474). It wrote Bank of the West that "we will not advance new funds until the margin is below the 80% maximum." Valley National's reasons were that collateral had been overvalued, and the loan to collateral ratio was too high. It refused to advance more money unless new collateral was properly valued, and various documentation was furnished. *Id.*

Bank of the West had gone over its $6 million lending limit, apparently because it had overlooked a $322,000 letter of credit. In May, Bank of the West asked Valley National to accept a transfer to its account of this $322,000 letter of credit. At this point, Bank of the West knew more than Valley National about how bad the Technical Equities risk was, because of the two undisclosed reports. Valley National refused, despite its relative ignorance. Its reasons were that the documentation it had requested in April had not been received, and it had frozen the line of credit. (Ex 279–80).

In July, Valley National responded to Bank of the West's inquiry of how Valley National interpreted the participation credit risk, stating in a letter that "participation is on a 'pro rata' basis," and "we view the credit risk to be on a 'pro rata' basis, subject to the terms of the participation agreement, even though we have not gotten the benefit of pro rata outstanding balances." (Ex 477). The letter also said Valley National looked forward to getting the additional information and "input" "to structure a deal that makes sense to both banks, after the maturity of the current commitment." *Id.*

In October, Bank of the West asked Valley National to send the additional money necessary to bring its share of the loan up to 50%. Despite having frozen its own line of credit long before, Valley National substantially agreed. In October, the banks signed a new participation agreement, and Valley National advanced an additional $1.18 million to bring its share up to 50%, about $5.15 million each.

Technical Equities filed for bankruptcy in February of 1986. (Ex 185 ¶ 26). Its failure led to numerous lawsuits involving the banks. Hundreds of Technical Equities investors sued Bank of the West and others. Bank of the West sued Technical Equities accountants and underwriters. Bank of the West spent about $5 million on settlements and almost $6 million on attorneys' fees to defend against the investors' suits, and collected $5 million in settlements from Technical Equities' accountants and others, leaving it with a net expense of about $6 million. (Supp.Ex 378, 420). Bank of the West then sued Valley National to recover one-half of the $6 million as "extraordinary expenses," pursuant to the participation agreement. (Ex 428 ¶ 6). Valley National denied that the expenses were covered by the "extraordinary expenses" clause, and counterclaimed for fraud, based on Bank of the West's concealment of the Anderson and Robbins reports.

The district court granted summary judgment in favor of Bank of the West on liability for the extraordinary expenses claim, but let the reasonableness of the amount of expenses, and the fraud counterclaim, go to trial. (Ex 144–57). At the close of the evidence, the court directed a verdict on the amount of extraordinary expenses, because Valley National put on no evidence demonstrating unreasonableness, the only factual issue in contention. (Supp.Ex 185–86, 363). Valley National won a jury verdict on its fraud counterclaim, for $2 million compensatory and $4 million in punitive damages. (Ex 691–98). The district court granted judgment in favor of Bank of the West notwithstanding the verdict. (Ex 703). In calculating the judgment, the court deducted approximately $1 million from Bank of the West's reasonable expenses, because its liability insurer had covered that much of the loss.

The district court set aside the fraud verdict because it found that: (1) Valley National was contractually obligated to make the October payment which brought its share to 50%, so the payment was not made based upon a fraudulent concealment; (2) Valley National was contractually obligated to make its own independent assessment of Technical Equities' creditworthiness, so could not have

justifiably relied on Bank of the West; (3) Valley National could not have justifiably relied on Bank of the West's prior assessment of Technical Equities' creditworthiness after receiving the cross copy of the September letter in which Bank of the West told Technical Equities why it was freezing the line of credit; and (4) Valley National's loss was caused by Technical Equities' collapse, not any concealment by Bank of the West. (Ex 702–03). The court also found that the evidence was insufficient to establish fraud by clear and convincing evidence. *Id.* We affirm without reaching all these issues.

## II. ANALYSIS

■ We review the district court's grant of summary judgment, directed verdict, and judgment notwithstanding the verdict *de novo. Jones v. Union Pac. R.R. Co.,* 968 F.2d 937, 940 (9th Cir.1992) (summary judgment); *In re Hawaii Fed. Asbestos Cases,* 960 F.2d 806, 816 (9th Cir.1992) (directed verdict); *Erickson v. Pierce County,* 960 F.2d 801, 804 (9th Cir.) (JNOV), *cert. denied,* — U.S. ——, 113 S.Ct. 815, 121 L.Ed.2d 687 (1992). California law is controlling in this diversity action because the participation agreement provides that the "agreement and the performance thereof shall be governed by the laws of the State of California." (Ex 431, ¶ 13).

### A. Fraud

■ To prevail on its fraud claim, Valley National had to prove five elements: "(1) misrepresentation (false representation, concealment, or non-disclosure); (2) knowledge of falsity (or 'scienter'); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Hackethal v. National Casualty Co.,* 189 Cal.App.3d 1102, 1111, 234 Cal.Rptr. 853 (1987).

■ Even though the jury returned a verdict for Valley National of compensatory and punitive damages for fraud, the district judge granted a judgment notwithstanding the verdict to Bank of the West. We must determine, *de novo,* whether viewing the evidence as a whole, there was substantial evidence present that could support a finding, by reasonable jurors, for Valley National. *Founti-*

*la v. Carter,* 571 F.2d 487, 489–90 (9th Cir. 1978). There was not. The justifiable reliance element for fraud was entirely absent.

■ Valley National claims that regardless of the contractual terms, it did, in fact, rely on Bank of the West for important information concerning the borrower. We assume, without deciding, that under California law extrinsic evidence of this reliance could properly be considered in construing the contract. *See Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 37–40, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). This reliance in fact does not change the parties' agreement that Valley National would make its own judgment about Technical Equities' creditworthiness, without reliance on Bank of the West. Extrinsic evidence of custom can only be used to prove an interpretation to which the contract is reasonably susceptible. *Southern Pac. Land Co. v. Westlake Farms, Inc.,* 188 Cal.App.3d 807, 815–16, 233 Cal.Rptr. 794 (1987). In this case, the clear and explicit language of the contract prevented justifiable reliance. Cal.Civ.Code § 1638.

Bank of the West had, before the Anderson and Robbins reports, been entirely forthcoming about sharing information with Valley National. We assume without deciding that it should have shared those as well. So far as the record shows, Valley National participated in the loan without much independent evaluation, largely on the basis of Bank of the West's judgment.

Valley National acted as though the relationship was that of a lead bank doing all the investigation and exercising all the judgment, and the participating bank passively investing in the lead bank's lending program. Valley National's problem is that regardless of what they actually did, the banks expressly agreed to a relationship in which each would investigate independently and exercise independent judgment. There was no lack of clarity in the contract, no mutual mistake, no reason to suppose that the parties mutually intended any relationship other than what the contract said. The loan participation agreement expressly provided that the Bank of the West "does not assume and shall have

no responsibility or liability" for Technical Equities' financial condition, the collateral, or collectibility of the loan. Valley National agreed that it "independently and without reliance upon any representations of Lender ... made and relied upon [its] own credit analysis and judgment." Valley National promised to "continue to make and rely upon" its own decisions "[i]ndependently and without reliance upon" Bank of the West.

Those are plain and strong words. The most favorable characterization of Valley National's conduct which the evidence allows is that it promised not to rely on Bank of the West, but then did in fact rely on Bank of the West. That necessarily implies that, to the extent that it did rely on Bank of the West, Valley National's reliance was not justifiable.

The contract could as a practical matter only control litigation outcomes, not conduct. Valley National might choose to advance millions of dollars without making an independent credit evaluation, in reliance on Bank of the West's judgment, even though it promised not to do that. That might be a rational business judgment, if experience with Bank of the West had always been very good, Technical Equities looked good, and an independent evaluation would cost more money than the value of the risk which it would likely avert. But the contract could and did control whether such reliance would be "justifiable" for purposes of a fraud claim. Valley National had sold to Bank of the West, by promising it away in paragraph 5, any right it might otherwise have to rely on Bank of the West's credit evaluations and judgment.

■ To the extent that any reliance might have been justifiable during the period when Bank of the West arguably hid negative information, March to September, Valley National proved no conduct in justifiable reliance, and no damages. Neither bank loaned any money to Technical Equities after February. Valley National did not advance any money to Bank of the West during the period when information was hidden. By the time Valley National did bring its advances up to the agreed upon amount, it had received the September letter, in which Bank of the West said the loan was not "something approxi-

mating conventional commercial bank lending."

B.  Extraordinary Expenses

■ Valley National contends that attorneys' fees and settlements in the investors' suits were not "extraordinary expenses" under paragraph 6 of the participation agreement. The issue here is whether Bank of the West was entitled to charge Valley National $3 million. That was half of what it spent, net, on lawyers' fees and settlements in the lawsuits by Technical Equities investors against the bank. It spent about $5 million on settlements and almost $6 million on attorneys' fees to defend against the investors' suits, and collected $5 million in settlements from Technical Equities' accountants and others, leaving it with a net expense of about $6 million.

The $6 million was "extraordinary expenses" under the language of the contract. The money was paid by Bank of the West "in connection with any" liability or expense arising out of a "claim relating to the Loan." Attorneys' fees are expressly included in the contractual definition.

■ Paragraph 6 separates expenses into two classes. One class was "the cost of servicing the loan." On a big loan like this, ordinary loan service would probably involve substantial expenses for staff salaries, as well as long distance telephone, express mail, fax, computer runs, and so forth, and possibly even some travel. The second class was "extraordinary expenses." Those were, basically, the kind of collection expenses involved when a loan goes sour. The purpose of the clause appears to be to have the lead bank bear the ordinary expenses, but to split the extraordinary expenses. Any multi-million dollar loss will naturally generate attempts to resist collection and redistribute losses to others through lawsuits. Victims of losses sometimes try to shift them to lenders through lenders' liability tort claims, especially where millions of dollars are at stake. Where there is enough money at stake to make it worthwhile for the people who have lost it to hire lawyers, it has to be expected that they may sue to shift the loss to someone else. The risk of such lawsuits appears

to have been contemplated by the two banks when they agreed upon paragraph 6.

■ We cannot accept Valley National's argument that the investors' suits were not related to the loan. The investors' suits claimed that Bank of the West kept Technical Equities afloat by its loans, enabling it to look more solvent than it was, while they sunk their money into it. (Supp.Ex 70). The "extraordinary expenses" were largely the amounts paid to lawyers to fight these lawsuits, and to the investors to settle them. Those expenses are "related" to the loan.

Valley National argues that we should not construe the paragraph so literally, but should instead consider custom in the industry. But it produced no evidence of a relevant custom. If banks had been shown by the evidence to have a customary understanding that "extraordinary expenses," in clauses like this, did not include fighting and settling third party lenders' liability lawsuits, that might have some bearing on the outcome. But the evidence was not there.

■ Valley National also argues that holding it to its promise would violate California public policy. California statute bars exemption of anyone from "responsibility for his own fraud ... to the person or property of another." Cal.Civ.Code § 1668. This policy does not apply to the facts proved. The fraud upon which Valley National relies for this argument is the alleged fraud Bank of the West committed against the investors in Technical Equities. The Technical Equity investors claimed that Bank of the West had contributed to a fraud against them, but they never proved it. Nor did Valley National.

■ Valley National argues that because it carried only 40% of the loan until October before the collapse, and got only 40% of the interest, it should be liable for, at most, 40% of the extraordinary expenses. We conclude that the district court's determination, 50%, was compelled by the contract. Valley National agreed in paragraph 6 that it would share "Extraordinary Expenses" in accordance with its respective "Participation Percentage. (Ex 427, 477). Valley National's "Participation Percentage" is specified in paragraph 1 as 50%.

In October 1985, Valley National became a 50% participant. It got the benefit of its increased share of interest for three months until the loan went bad. It would have made more money with its 50% share than with its previous lower share had Technical Equities paid off its loan. The benefit it obtained from bringing its share up to 50% was nowhere near the cost which equal shares imposed on it. Although it worked out badly for Valley National, that was the deal.

## C. Directed Verdict on Damages

■ The damages award for Valley National's share of the "extraordinary expenses" was $3.8 million for litigation expenses and settlements, including prejudgment interest. Although it allowed testimony at trial on damages, the court took the issue away from the jury and directed a verdict. Valley National argues that the amount should have gone to the jury. We reject the argument, because there was no substantial evidence which, viewing the evidence as a whole, could have supported a different verdict. *Orion Pictures Distrib. Corp. v. Syufy Enters.*, 829 F.2d 946, 948 (9th Cir.1987).

Bank of the West's damages witness presented the $10.8 million account total for extraordinary expenses. On cross examination he conceded that his account had some errors. (Ex 224–32, Supp.Ex 186). After reexamining the amount, he subtracted $214,000—roughly 2% of the total. (*Compare* Supp.Ex 378 *with* Supp.Ex 420). Valley National suggests that the errors impugned the witness' credibility to such an extent that the jury should have been given the damages issue. But the evidence included no suggestion of dishonesty or systematic error—just minor errors more or less inevitable in so large and complex an accounting. The jury could have no basis, on the evidence before them, for substituting a different number. Nor, on the evidence they had, could they have concluded that the number before them had no substantial basis. There was nothing a rational jury could do, on the evidence this one had, except return a verdict for the number as corrected.

Bank of the West spent a million dollars litigating a claim against Technical Equities' underwriter, and then dropped it without receiving a penny. Valley National argues that it should not have to split this as an "extraordinary expense," because pursuing the litigation and then dropping it was not "reasonable." But there was no evidence of unreasonableness. After vigorously pursuing the claim, Bank of the West's lawyers advised dropping the case. They thought the case was problematic. They feared that the attack on the underwriter would tend to weaken the defense against the Technical Equities investors. The underwriter would not pay anything in settlement. Bank of the West's lawyers thought that at best, the bank would be "spending a dollar of attorneys' fees for every dollar of expected recovery." (Ex 382). There was no evidence that any of this analysis was wrong, or that Bank of the West had overspent on attorneys. There is nothing inherently unreasonable about dropping a case because it appears to be a loser. Reason does not command throwing good money after bad. There was no reason to submit this question to the jury.

D. Insurance Offset Against Extraordinary Expenses

Bank of the West succeeded in having its liability insurer, Chubb, pay $1.14 million toward the loss. Chubb insured Bank of the West against lenders' liability claims of the sort which Bank of the West spent $11 million defending and settling. (*See* Ex 703 ¶ 4; Supp Ex 106). The district court subtracted this money from "extraordinary expenses." Valley National thereby got half of Bank of the West's liability insurance recovery. Bank of the West argues that it should not have had to share the benefit of liability insurance it paid for itself, for its own protection.

The participation agreement does not say anything about the collateral source rule. It applies to "expenses incurred or sustained by Lender." The only reference in the agreement to offsets against extraordinary expenses is the statement that they are to be reimbursed by Valley National only "to the extent such Extraordinary Expenses are

not collected from the Borrower." This offset does not apply, because the $1.14 million was collected from Chubb, not Technical Equities.

We conclude that Valley National was not entitled to an offset for the $1.14 million in liability insurance. This falls within the general principal that indemnitors must pay all the legal expenses of its indemnitee, even if the indemnitee's insurer already paid for the expenses. *See Long v. Keller*, 104 Cal.App.3d 312, 318, 163 Cal.Rptr. 532 (1980); *Tillman v. Wheaton–Haven Rec. Ass'n, Inc.*, 580 F.2d 1222, 1230 (4th Cir. 1978). An insurer may be subrogated to the policyholder's right to indemnity from a third party. *See Lesmark, Inc. v. Pryce*, 334 F.2d 942, 945 (D.C.Cir.1964). If that is so, there is no windfall to anyone. Even if the insurer is not entitled to subrogation, calling the insurance a windfall somewhat misstates the case. Bank of the West chose to bear the expense of purchasing the liability insurance, and Valley National did not contract to share in the benefit. We must remand so that the district court can correct the judgment by eliminating this offset against Bank of the West's claim.

AFFIRMED in part, REVERSED in part and REMANDED.